The PENNSYLVANIA ASSOCIATION
FOR RETARDED CHILDREN
et al., Plaintiffs,

v.

COMMONWEALTH OF PENNSYLVA-
NIA et al., Defendants.

No. 71–42.

United States District Court,
E. D. Pennsylvania.

May 5, 1972.

See also, D.C., 334 F.Supp. 1257.

Thomas Gilhool, Philadelphia, Pa., for plaintiffs.

Edward A. Weintraub, Deputy Atty. Gen., Harrisburg, Pa., for Commonwealth of Pennsylvania and all named defendants.

William B. Arnold, Lancaster, Pa., for Lancaster-Lebanon Intermediate Unit.

John D. Killian, Harrisburg, Pa., for Pennsylvania Association of Private Schools for Exceptional Children.

Before ADAMS, Circuit Judge, MASTERSON and BRODERICK, District Judges.

## OPINION, ORDER AND INJUNCTION

MASTERSON, District Judge.

This civil rights case, a class action, was brought by the Pennsylvania Association for Retarded Children [1] and the parents of thirteen individual retarded children on behalf of all mentally retard-

---

1. The Pennsylvania Association for Retarded Children (PARC) and its fifty-three member chapters constitutes an organization which for some 20 years has undertaken part of the burden of educating and training retarded children in the Commonwealth. In addition, PARC has sought to advance the general interests of retarded citizens of Pennsylvania.

ed persons between the ages 6 and 21 whom the Commonwealth of Pennsylvania, through its local school districts and intermediate units, is presently excluding from a program of education and training in the public schools.[2] Named as defendants are the Commonwealth of Pennsylvania, Secretary of Welfare, State Board of Education and thirteen individual school districts scattered throughout the Commonwealth. In addition, plaintiffs have joined all other school districts in the Commonwealth as class defendants of which the named districts are said to be representative.

The exclusions of retarded children complained of are based upon four State statutes: (1) 24 Purd.Stat. Sec. 13–1375 [3] which relieves the State Board of Education from any obligation to educate a child whom a public school psychologist certifies as uneducable and untrainable. The burden of caring for such a child then shifts to the Department of Welfare which has no obligation to provide any educational services for the child; (2) 24 Purd.Stat. Sec. 13–1304 [4] which allows an indefinite postponement of admission to public school of any child who has not attained a mental age of five years; (3) Purd.Stat. Sec. 13–1330 [5] which appears to *excuse* any child from compulsory school attendance whom a psychologist finds unable to profit therefrom and (4) 24 Purd.Stat. Sec. 13–1326 [6] which defines compulsory school age as 8 to 17 years but has been used in practice to postpone admissions of retarded children until age 8 or to eliminate them from public schools at age 17.

2. The parties have stipulated that when the complaint was filed, all the named plaintiffs were being excluded from any program of public education and training. See, *passim*, Statement of Uncontested Facts—Docket #97.

3. 24 Purd.Stat. Sec. 13–1375 provides:
   "*Uneducable children provided for by Department of Public Welfare.* The State Board of Education shall establish standards for temporary or permanent exclusion from the public school of children who are found to be uneducable and untrainable in the public schools. Any child who is reported by a person who is certificated as a public school psychologist as being uneducable and untrainable in the public schools, may be reported by the board of school directors to the Superintendent of Public Instruction and when approved by him, in accordance with the standards of the State Board of Education, shall be certified to the Department of Public Welfare as a child who is uneducable and untrainable in the public schools. When a child is thus certified, the public schools shall be relieved of the obligation of providing education or training for such child. The Department of Public Welfare shall thereupon arrange for the care, training and supervision of such child in a manner not inconsistent with the laws governing mentally defective individuals."

4. 24 Purd.Stat. Sec. 13–1304 provides:
   "*Admission of beginners.*
   . . . The board of school directors may refuse to accept or retain beginners who have not attained a mental age of five years . . . ."
   In certain instances this statute results in permanent exclusion since it is theoretically possible for a child with an I. Q. of 35 or below (the I. Q. intelligence test is normally relied upon to establish a mental age) never to achieve a mental age of five years. This result occurs because the I. Q. ratio levels off at chronological age 15. See N.T. 79–80 (August 12 Hearing) (Dr. James Gallagher).

5. 24 Purd.Stat. Sec. 13–1330 provides:
   "*Exceptions to compulsory attendance.* The provisions of this act requiring regular attendance shall not apply to any child who: . . .
   (2) Has been examined by an approved mental clinic or by a person certificated as a public school psychologist or psychological examiner, and has been found to be unable to profit from further public school attendance, and who has been reported to the board of school directors and excused, in accordance with regulations prescribed by the State Board of Education; . . . ."

6. 24 Purd.Stat. Sec. 13–1326 provides:
   "*Definitions.* The term 'compulsory school age,' as hereinafter used, shall mean the period of a child's life from the time the child's parents elect to have the child enter school, which shall be not later than at the age of eight (8) years, until the age of seventeen (17) years."

Plaintiffs allege that Sections 1375 (uneducable and untrainable) and 1304 (mental age of 5 years) are constitutionally infirm both on their faces and as applied in three broad respects. First, plaintiffs argue that these statutes offend due process because they lack any provision for notice and a hearing before a retarded person is either excluded from a public education or a change is made in his educational assignment within the public system.[7] Secondly, they assert that the two provisions violate equal protection because the premise of the statute which necessarily assumes that certain retarded children are uneducable and untrainable lacks a rational basis in fact.[8] Finally, plaintiffs contend that because the Constitution and laws of Pennsylvania guarantee an education to all children,[9] these two sections violate due process in that they arbitrarily and capriciously deny that given right to retarded children. Plaintiffs' third contention also raises a pendent question of state law, that is, whether the Pennsylvania Constitution as well as other laws of the Commonwealth already afford them a right to public education.

It is not alleged that Sections 1330 (excusal from compulsory attendance) or 1326 (definition of compulsory school age) are facially defective under the United States Constitution. Rather, plaintiffs contend that these provisions violate due process (lack of a prior hearing) and equal protection (no basis in fact to support exclusion) *as applied* to retarded children.

In addition, plaintiffs contend that the clear intent of Section 1330 is to forgive *parents* from any criminal penalty for what otherwise would be a violation of compulsory attendance requirements, and consequently, use of this provision to *exclude* retarded children constitutes an impermissible misinterpretation of state law. Likewise, plaintiffs

7. In general, the public sector has four possible assignments for the retarded child: regular, retarded-educable, retarded-trainable, and uneducable-untrainable.

8. Counsel for the plaintiffs asserts in his Memorandum in Support of Plaintiff's Motion to Convene a Three Judge Court that the right to an education, once given, constitutes a fundamenal right, and therefore the defendants must show a compelling state interest in order to lawfully exclude retarded children. Cf. Brown v. Board of Education, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955); Compare, Shapiro v. Thompson, 394 U.S. 618, 634, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) (travel); Loving v. Virginia, 388 U.S. 1, 9, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) (race); Harper v. Virginia State Board of Elections, 383 U.S. 663, 670, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966). (voting)

But we are satisfied that the plaintiffs have established a colorable constitutional claim even under the less stringent rational basis test, and consequently we need not decide whether the Commonwealth must demonstrate a compelling state interest in order to dispose of the narrow issues presently before us.

Plaintiffs also allege in their *complaint* that Sections 1375 and 1304 violate equal protection in that (1) they condition a retarded child's education upon the impermissible criteria of wealth and (2) they require the retarded child's parents to pay additional monies to secure his education even though these parents are taxed for support of a system of public education. Once again, because of our satisfaction with the colorability of the equal protection claim apart from possible discrimination against poor persons, we need not face these issues.

9. Plaintiffs point to Art. 3, § 14 of the Pennsylvania Constitution, P.S. which reads:

"The General Assembly shall provide for the maintenance and support of a thorough and efficient system of public education to serve the needs of the Commonwealth;"

24 Purd.Stat. 13–1301, which provides:

"Every child, being a resident of any school district, between the ages of six (6) and twenty-one (21) years, may attend the public schools in his district, subject to the provisions of this act;"

and 24 Purd.Stat. 13–1326 which reads in part,

"The term 'compulsory school age,' as hereinafter used, shall mean the period of a child's life from the time the child's parents elect to have the child enter school, which shall be not later than at the age of eight (8) years."

assert that Section 1326 relates only to the obligation of *parents* (under penalty of criminal sanctions) to place their children in public schools, and its use to *exclude* retarded children contravenes the obvious meaning of the statute. To place these questions of state law before us, plaintiffs advance the principle of pendent jurisdiction.

Plaintiffs predicate jurisdiction of this court upon 28 U.S.C. § 1343(3)[10] and their causes of action under 42 U.S.C. §§ 1981[11] and 1983.[12] By way of relief, they seek both a declaratory judgment that the statutes are unconstitutional and a preliminary and permanent injunction against the enforcement of these laws by the defendants.[13] On the basis of these pleadings, it was concluded that the case raised important and substantial federal questions requiring consideration by a three judge court under 28 U.S.C. § 2281.[14]

Shortly after the appointment of the three judge Court by the Chief Judge of the Court of Appeals, we entered an order fixing June 15, 1971 as the hearing date on plaintiffs' motion for a preliminary injunction and June 11, 1971 as the date for prehearing conference. Between the date of our order and June 11th, however, the parties asked for an opportunity to settle amicably at least that part of the case which related to the plaintiffs' demand for due process hearings before exclusion from a public school education or a change in educational assignment within the public system is ordered. To afford them such an opportunity, we vacated our earlier order and postponed the hearing date until August 12th, 1971 and set August 2nd, 1971 as the final pre-hearing conference date.

In the interim, the parties agreed upon a Stipulation which basically provides that no child who is mentally retarded or thought to be mentally retarded can be assigned initially (or re-assigned) to either a regular or special educational status, or excluded from a public education without a prior recorded

10. § 1343. *Civil rights and elective franchise.*
The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:
(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege, or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States.

11. § 1981. *Equal rights under the law.*
All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

12. § 1983. *Civil action for deprivation of rights.*
Every person who, under color of any statute, ordinance, regulation, custom, or

usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other persons within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceedings for redress.

13. See 28 U.S.C. §§ 2201 and 2202.

14. 28 U.S.C. § 2281. *Injunction against enforcement of State statute three-judge court required.*
An interlocutory or permanent injunction restraining the enforcement, operation or execution of any State statute by restraining the action of any officer of such State in the enforcement or execution of such statute or of an order made by an administrative board or commission acting under State statutes, shall not be granted by any district court or judge thereof upon the ground of the unconstitutionality of such statute unless the application therefor is heard and determined by a district court of three judges under section 2284 of this title.

hearing before a special hearing officer. At that hearing, parents have the right to representation by counsel, to examine their child's records, to compel the attendance of school officials who may have relevant evidence to offer, to cross-examine witnesses testifying on behalf of school officials and to introduce evidence of their own. On June 18th, this Court entered an interim order approving the Stipulation.

In mid-August, as scheduled, we heard plaintiffs' evidence relating to both the due process and equal protection claims, although the evidence was particularly directed toward the unresolved question of equal protection. Following testimony by four eminent experts in the field of education of retarded children,[14a] the parties once again expressed a desire to settle the equal protection dispute by agreement rather than judicial determination. We then suspended further testimony in order to afford the parties time to resolve the remaining issues.

On October 7th, 1971 the parties submitted a Consent Agreement to this Court which, along with the June 18th Stipulation, would settle the entire case. Essentially, this Agreement deals with the four state statutes in an effort to eliminate the alleged equal protection problems. As a proposed cure, the defendants agreed, *inter alia*, that since "the Commonwealth of Pennsylvania has undertaken to provide a free public education for all of its children between the ages of six and twenty-one years" (Paragraph 5), therefore, "it is the Commonwealth's obligation to place each mentally retarded child in a *free, public program of education and training appropriate to the child's capacity*." (Paragraph 7.) To effectuate this result without conceding the unconstitutionality of the foregoing statutes or upsetting the existing statutory scheme, the Attorney General of the Commonwealth agreed to issue Opinions declaring in substance that: (1) Section 1375 means that "insofar as the Department of Public Welfare is charged to arrange for the care, training and supervision of a child certified to it, the Department of Public Welfare must provide a program of education and training appropriate to the capacities of that child" (Paragraph 37); (2) Section 1304 means "*only* that a school district may refuse to accept into or retain in the lowest grade of the *regular* primary school [as contrasted with a *special* primary school]. any child

---

14a. The court heard from (1) *I. Ignacy Goldberg*, who is, *inter alia*, Professor of Education, Department of Special Education, Columbia University; member of the President's Panel on Mental Retardation (1961); consultant to the Children's Bureau, Department of Health, Education and Welfare; Scientific Advisory Board member of the Kennedy Child Study Center, New York; and author or co-author of almost 50 publications on mental retardation; (2) *James J. Gallagher*, who is, *inter alia*, the first Director of the Bureau of Education for the Handicapped and Associate Commissioner of Education, U. S. Office of Education, Department of Health, Education and Welfare (1967–1969); Deputy Assistant Secretary for Program Planning, Research and Education, Department of Health, Education and Welfare; Director, Frank Porter Graham Child Development Center, University of North Carolina; and author or co-author of some 30 publications on the education of retarded persons; *Donald J. Steadman*, who is, *inter alia*, first Associate Director of the John F. Kennedy Center for Research on Education and Human Development, Peabody College; Professor and Chairman of the Division of Human Development in the School of Education, University of North Carolina; Associate Editor of the Journal of Mental Deficiency; author or co-author of some 30 publications on the mentally retarded; and a permanent consultant to the President's Committee on Mental Retardation; and *Burton Blatt*, who is, *inter alia*, Centennial Professor and Director, Division of Special Education and Rehabilitation, Syracuse University; member of the first Connecticut State Advisory Council on Mental Retardation; member of the State of New York Committee for Children; member of the National Advisory Committee of the R & D Center for Handicapped Children of Teachers College, Columbia University; and author or co-author of almost 90 publications.

who has not attained a mental age of five years" (Paragraph 10); (3) Section 1330(2) means "*only* that a parent may be excused from liability under the compulsory attendance provisions of the School Code when, with the approval of the local school board and the Secretary of Education and the finding by an approved school psychologist, the parent elects to withdraw the child from attendance; Section 1330(2) may not be used by defendants, contrary to parents' wishes, to terminate or in any way deny access to a free public program of education and training to any mentally retarded child." (Paragraph 20); and (4) Section 1326 means "*only* that parents of a child have a compulsory duty while the child is between eight and seventeen years of age to assure his attendance in a program of education and training; and Section 1326 does not limit the ages between which a child must be granted access to a free public program of education and training [and may not be used as such]." (Paragraph 16.) Thus, possible use of these four provisions to exclude (or postpone) retarded children from a program of public education was effectively foreclosed by this Agreement. And on October 22, 1971, the Attorney General issued these agreed upon Opinions.

In addition, the Consent Agreement addresses itself to three other matters involving the education of retarded children which the plaintiffs did not specifically raise in their pleadings. First, in the area of pre-school education, the defendants agreed to cease applying 24 Purd.Stat. Sec. 13–1371 [15] so as to deny retarded children below the age of six access to a free pre-school program of education and training appropriate to their learning capacities whenever the school districts provide such a pre-school program to *normal* children below the age of six. The Attorney General again issued an Opinion so interpreting Section 1371(1).

Next, the defendants agreed to cease applying 24 Purd.Stat. Sec. 13–1376 [16] so as to deny tuition or tuition maintenance to any mentally retarded person. Basically, Section 1376 provides for the payment of tuition to private schools by the Commonwealth and local school districts (75% and 25% respectively) where, with the approval of the Department of Education, a child afflicted with blindness, deafness, cerebral palsy, brain damage or muscular dystrophy is attending a private school. Prior to the Consent Agreement, this statute was interpreted not to apply to retarded children unless they also suffered from one of

15. 24 Purd.Stat., Sec. 13–1371(1)
   "*Definition of exceptional children; reports; examination.*
   (1) The term 'exceptional children' shall mean children of school age who deviate from the average in physical, mental, emotional or social characteristics to such an extent that they require special educational facilities or services and shall include all children in detention homes."

16. 24 Purd.Stat. Sec. 13–1376
   "*Cost of tuition and maintenance of certain exceptional children in approved institutions*
   (a) When any child between the ages of six (6) and twenty-one (21) years of age resident in this Commonwealth, who is blind or deaf, or afflicted with cerebral palsy and/or brain damage and/or muscular dystrophy, is enrolled, with the approval of the De-

partment of Public Instruction, as a pupil in any of the schools or institutions for the blind or deaf, or cerebral palsied and/or brain damaged and/or muscular dystrophied, under the supervision of, subject to the review of or approved by the Department of Public Instruction, in accordance with standards and regulations promulgated by the Council of Basic Education, the School District in which such child is resident shall pay twenty-five per centum (25%) of the cost of tuition and maintenance of such child in such school or institution, as determined by the Department of Public Instruction; and the Commonwealth shall pay, out of funds appropriated to the department for special education, seventy-five per centum (75%) of the cost of their tuition and maintenance, as determined by the Department.

the maladies mentioned above. Consequently, if the public sector excluded a retarded child (who lacked a multiple disability) under Section 1375, 1304, 1330 or 1326, his parents had to assume the full financial burden of educating and training him in a private school. Often, because of the special care required, this burden assumed formidable proportions.[17] Thus, the Attorney General issued an Opinion "construing the term 'brain damage' as used in Section 1376 . . . so as to include thereunder all mentally retarded persons, thereby making available to them tuition for day school and tuition and maintenance for residential school . . ." (Paragraph 27).

Finally, the defendants agreed to cease applying 24 Purd.Stat. Sec. 13–1372(3) [18] so as "to deny [mentally retarded children] homebound instruction under that Section . . . merely because no physical disability accompanies the retardation or because retardation is not a short-term disability." (Paragraph 31.) Once again, the Attorney General issued an Opinion so construing this provision.

The lengthy Consent Agreement concludes by stating that "[e]very retarded person between the ages of six and twenty-one shall be provided access to a free public program of education and training appropriate to his capacities as soon as possible but in no event later

17. Leonard Kalish, Esq., appearing *pro se* on behalf of his fifteen year old daughter who is a member of the plaintiff class stated that his child has been excluded from a public education all of her life. He continued:

"I would just like to call to the Court's attention what the realities of that situation are, and I think I can speak with some authority because for the last nine years, my fifteen year old daughter has been denied access to public education without due process, but consistently denied, and as a result of which we have had her in private schools for the last nine years.

Now in those nine years, not counting the present year, not counting the year which started last summer, we have spent approximately forty thousand dollars on her private schooling, shall I say. At the present time we have her in a private school, a residential school where we pay a tuition of twelve thousand dollars a year, and I want to say to the Court that what I am saying here too our situation is paralleled by many other situations of many other children, and their parents.

Now if a public facility were established that comes anywhere near striking the distance of appropriateness for my child, Your Honors can rest assured that I will welcome that public facility with open arms. The financial burden of giving my child private education is very considerable. There is no pride or status symbol involved in having a child in a private school such as the private schools to which my child and others in the same situation

would go. In other words, it isn't out of any feeling of status that I am undertaking this heavy financial burden. It is simply because there is no public facility.

Now the moment a public facility is indicated, even just on the drawing board or on brochures, or papers of any kind which will look reasonably appropriate, I will assure Your Honors that ninety-five per cent or more of all parents will rush to get their children in there because everyone of the parents is laboring under a backbreaking financial burden. We're not talking about wealthy people here. We are talking about ordinary people, and I know a great many of them who send their children to the same school where I send mine, and I have had my child in one other school before this, and I have had her with a private tutor for a year."

18. 24 Purd.Stat. Section 1372(3)
"Standards; plans; special classes or schools

\*     \*     \*     \*     \*

(3) Special Classes or Schools Established and Maintained by School Districts.

" . . . If . . . it is not feasible to form a special class in any district or to provide such education for any [exceptional] child in the public schools of the district, the board of school directors of the district shall secure such proper education and training outside the public schools of the district or in special institutions, or by providing for teaching the child in his home. . . ."

than *September 1, 1972.*" (Paragraph 42.) To implement the agreed upon relief and assure that it would be extended to all members of this class, Dennis E. Haggerty, Esq., a distinguished member of the Pennsylvania Bar who has devoted much of his energy to the welfare of retarded children, and Dr. Herbert Goldstein, an eminent expert in the education of retarded children who is Professor and Director of the Curriculum Research and Development Center in Mental Retardation at the Ferkaus Graduate School of Humanities and Social Sciences, Yeshiva University, were appointed Masters at the expense of the Commonwealth. (Paragraph 45). Next, the Consent Agreement charges defendants with the duty within 30 days, to formulate and submit to the Masters a plan to locate, evaluate and give notice to all members of the plaintiff class. (Paragraph 47). Finally, and perhaps most importantly, the Agreement states that:

"The defendants shall formulate and submit to the Masters for their approval *a plan to be effectuated by September 1, 1972,* to commence or recommence a free public program of education and training for all mentally retarded persons . . . aged between four and twenty-one years as of the date of this Order, and for all mentally retarded persons of such ages hereafter. The plan shall specify the range of programs of education and training, there [sic] kind and number, necessary to provide an appropriate program of education and training to all mentally retarded children, where they shall be conducted, arrangements for their financing, and, if additional teachers are found to be necessary, the plan shall specify recruitment, hiring, and training arrangements." (Paragraph 49) (emphasis added).

Thus, if all goes according to plan, Pennsylvania should be providing a meaningful program of education and training to every retarded child in the Commonwealth by September, 1972.

We then entered an *interim order,* without prejudice, pending notice to the class of plaintiffs and the class of defendants, which temporarily enjoined the defendants from applying (1) 24 Purd.Stat. Sections 13–1375, 1304, 1330 (2), and 1371(1) "so as to deny any mentally retarded child access to a free public program of education and training;" (2) Section 13–1376 "so as to deny tuition or tuition and maintenance to any mentally retarded person except on the same terms as may be applied to other exceptional children, including brain damaged children generally;" and (3) Section 13–1372(3) "[so as to deny] homebound instruction to any mentally retarded person merely because no physical disability accompanies the retardation or because it is not a short-term disability." [19]

Next, in accordance with Rule 23(e), F.R.Civ.P.,[20] a hearing was scheduled on any objections to the proposed settlement Agreements. We instructed the named plaintiffs and defendants to noti-

---

19. Our power to enter an injunction does not stem from a finding that the State statutes contravene the United States Constitution or that the state officers acted in an unconstitutional manner. We make no such findings in this opinion. We hold, however, that the plaintiffs have established a colorable constitutional claim, (see pages 293–297 infra) and hence the court has jurisdiction under 28 U.S.C. § 1343(3). Once jurisdiction is established, we then have the judicial power necessary to approve and enforce a settlement agreement. See Kelly v. Greer, 365 F.2d 669 (3rd Cir. 1966), cert. denied, 385 U.S. 1035, 87 S.Ct. 772, 17 L.

Ed.2d 682 (1967) ; Berger v. Grace Line Inc., 343 F.Supp. 755 (E.D.Pa.1972). On this basis, we issued the Injunction to insure that all school districts and intermediate units in the Commonwealth would clearly understand that this class action binds them to follow our Order approving the settlement.

20. 23(e) *Dismissal or Compromise.* A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs.

fy all remaining members of their respective classes (primarily by newspaper in the case of plaintiffs and by direct mailing for the defendants). Proper notice went out to the plaintiffs and only one appeared at the hearing.[21] None of the remaining defendants appeared, however, because the Commonwealth neglected to send them any notice.[22] Consequently, we ordered that new notice be given, and rescheduled the hearing for November 12, 1971.

Notice of that hearing went out about October 29th,[23] and Philip Salkin, Esq. and William B. Arnold, Esq. appeared and filed objections on behalf of the Montgomery County Intermediate Unit and the Lancaster-Lebanon Intermediate Unit respectively. In addition, John D. Killian, Esq. appeared and objected for the Pennsylvania Association of Private Schools for Exceptional Children.

Both attorneys for the Intermediate Units argued to the Court that the notice they received was inadequate to prepare their cases against both the Stipulation of June 18th and the Consent Agreement of October 7th.[24] They also argued that many districts and intermediate units failed to appear because they did not have enough time to analyze and react to the two rather lengthy and intricate proposals. The attorneys pointed out that since most school boards meet on the first week of each month, these bodies would not even have an opportunity to review the documents until after December 1st.[25]

To extend every element of fairness in this important litigation, we ordered that a *second individual notice* be sent to all 29 intermediate units and 569 school districts, extending them an opportunity to object and be heard at yet another hearing on December 15, 1971. Following this second notice, the Allegheny Intermediate Unit No. 3, Chester County Intermediate Unit No. 24, Schuylkill Intermediate Unit No. 29, Delaware County Intermediate Unit, and 9 individual school districts within these four Units joined the opponents of the settlement.

On December 15th and 16th, we heard from the objectors and their witnesses. Essentially, the complaining defendants challenged parts of the June 18th Stipulation (dealing with due process hearings) which they claimed were unnecessary, burdensome and administratively unwieldy and impractical.[26] The wisdom of a few minor portions of the October 7th Consent Agreement was also questioned.[27] Apart from questioning certain details of the Agreements, the objectors challenged our jurisdiction over the case and over themselves as purported members of a class. Finally, they raised the issue of abstention.

Following this testimony, the proponents of the settlement met with the objectors in an effort to modify the two documents so as to satisfy every one involved. Intensive negotiations ensued. Final legal argument was scheduled for January 31, 1972.

At the request of the litigants, we postponed final argument until Febru-

---

21. Mr. Leonard Kalish, Esq. appeared on behalf of his daughter, a member of the plaintiff class. He did not object to the substance of the proposed Consent Agreement, but only questioned the absence of a precise definition of mental retardation. His motion was later compromised, and he has withdrawn his objection.

22. N.T. at 4–7 (Hearing of October 22, 1971).

23. N.T. at 40 (Hearing of November 12, 1971).

24. *Id.* at 45.

25. *Id.* at 48.

26. For example, the original Stipulation provided for *two* notices to the parents of their right to a hearing and made no provision for waiver of the hearing. The objecting defendants took issue with these features.

27. For example, the defendants disagreed with the need for an automatic re-evaluation of retarded children in special classes every two years and the mandatory requirement that homebound instruction involve education and training for at least five hours a week.

ary 7, 1972. On that date, only *one* defendant remained—the Lancaster-Lebanon Intermediate Unit. All others had withdrawn their objections because subsequent modifications of the Stipulation and Consent Agreement by the proponents satisfied their complaints.[28] The Pennsylvania Association of Private Schools for Exceptional Children (which is not a member of either class) also expressed dissatisfaction at that hearing.

The arguments presented by Lancaster-Lebanon are essentially legal, that is, the Intermediate Unit does not question the *fairness* of the proposed settlement to the members of either class,[29] rather it seeks to destroy the Agreements altogether by raising the issue of jurisdiction as well as the oft-mentioned, but seldom fully understood, issue of abstention.

## I. JURISDICTION

### A. *Controversy Under Article III*

■ Preliminarily, the issue of whether the Lancaster-Lebanon Intermediate Unit can even raise jurisdictional issues at a hearing on the proposed settlement of a class action under Rule 23(e) arises. Theoretically, the scope of such a hearing is limited to an inquiry into the fairness of the settlement. See Moore's Federal Practice, § 23.80(4). Since jurisdictional issues relate to the very power of this court to hear this case and bind the parties, however, we think that the objectors must be permitted to raise them.

Although not particularly pressed at final oral argument (which was devoted primarily to abstention), Lancaster-Lebanon has raised two distinct jurisdiction-

al issues throughout this litigation. First, Lancaster-Lebanon charges that there is no controversy before this court within the meaning of Article III, Sec. 2 of the United States Constitution because of alleged collusion and total agreement on the merits between the plaintiffs and the Commonwealth in conducting this suit. Secondly, the Intermediate Unit contends that this Court lacks jurisdiction to bind it to any Consent Agreement because the Lancaster-Lebanon Unit received no notice and had no opportunity to appear when the suit was first instituted. (See Section I. B., infra.). We find both contentions without merit.

■ Undoubtedly, if two litigants commence a suit with the same goals in mind, no controversy exists to give the district court jurisdiction as required by Article III, Sec. 2. See Moore v. Charlotte-Mecklenburg Board of Education, 402 U.S. 47, 91 S.Ct. 1292, 28 L.Ed.2d 590 (1971); United States v. Johnson, 319 U.S. 302, 63 S.Ct. 1075, 87 L.Ed. 1413 (1943); Muskrat v. United States, 219 U.S. 346, 31 S.Ct. 250, 55 L.Ed. 246 (1911). But a different case arises when litigants *begin* a suit as adversaries, and then at some later point decide to compromise the dispute. In such an instance, the court does not *ipso facto* lose jurisdiction over the matter for want of a controversy. Cf. Dixon v. Attorney General of Com. of Pa., 325 F. Supp. 966 (E.D.Pa.1971) (Biggs, Circuit Judge). This latter rule flows from common sense as well as the fact that even in preparing a compromise, the parties may remain adversaries within the meaning of Article III.

---

28. An amended Stipulation and Amended Consent Agreement were filed with this Court on February 18, 1972. The general import of these documents, however, remained the same as explained in our extended analysis above; therefore, we need not review them again.

29. "[T]his Intermediate Unit approves the *general aims* of the interim order to improve the education and training opportunities of mentally retarded children

. . . ." Objections by Lancaster-Lebanon Intermediate Unit No. 13 at 1 (emphasis original); "[W]e agree with the general aims, of course we do. It is an enlightened objective."
(N.T. 26 49—Hearing of November 12, 1971) (Statement of William B. Arnold, Esq.). In response to Judge Masterson's questioning, Mr. Arnold did not cite any specific objections to any provisions of the Consent Agreement. (N.T. at 43—Hearing of February 7, 1972).

The record in this case clearly shows that the Commonwealth did not collaborate with the plaintiffs in bringing or conducting this suit. Indeed, from January until June, 1971, the Attorney General and the thirteen named school districts vigorously contested every phase of plaintiffs' case. First, the Commonwealth filed motions to dismiss which were accompanied by elaborate briefs. The defendants denied jurisdiction, denied that a claim had been stated upon which relief might be granted, denied that plaintiffs had raised a substantial federal question, and questioned whether PARC had standing to sue. On the merits, they asserted that all of the statutes attacked were founded upon rational bases.[30] Subsequently, the defendants filed a 13 page brief opposing plaintiffs' motion to convene a three-judge court. Moreover, in discovery, the defendants resisted the production of certain documents and the parties had to appeal to this Court for resolution of the dispute.

In June, 1971, it is true, the parties agreed to settle the issue of due process hearings. Even so, the defendants did not give the plaintiffs carte blanche to draw up any proposal of their choosing; rather the arts of negotiation and compromise were employed, with Commonwealth experts in the field of education also taking part in the discussions.[31]

Despite negotiations on this front, the defendants steadfastly adhered to their original position on plaintiffs' equal protection claims. Indeed, it was not until after a day of testimony from four distinguished experts that the Commonwealth agreed to relent on this issue as well. Far from an indication of collusion, however, the Commonwealth's willingness to settle this dispute reflects an intelligent response to overwhelming evidence against their position.

Once the compromise was prepared, of course, plaintiffs and the named defendants shared identical interests in seeking approval of the settlement. Nevertheless, because these defendants refused to concede the unconstitutionality of the statutes and continued to enforce them, the parties remained adversaries on the constitutional issues which are critical to our jurisdiction. Hence, we conclude that a controversy exists under Article III, Sec. 2.

### B. *Over the Parties*

■ Next, Lancaster-Lebanon argues that it is not bound by these Consent Agreements or the Injunction because this Court lacks jurisdiction, not necessarily over the subject matter, but over it as a party. The Intermediate Unit predicates this assertion upon the concept that under the Due Process Clause, notice at the commencement of the litigation constitutes a prerequisite to a court's jurisdiction over the parties. As applied to the facts of this case, however, we disagree.

We begin by holding that the *defendants* constitute a class under Rule 23(B)(1)(B), F.R.Civ.P. This section is appropriate because, as a practical matter, once the issues are decided against one school district within an intermediate unit, or one intermediate unit within the Commonwealth all other districts or intermediate units will ultimately be bound by the result. In other words, "adjudications with respect to individual members of the class [would] as a practical matter be dispositive of the inter-

---

30. "The reasonableness of this distinction is so clear as to admit of no argument. A child who is uneducable and untrainable requires treatment different from those children of the other classifications. To place the retarded child in the public classroom is to subject such child to frustration since he cannot compete mentally with the other children, to subject him to ridicule by other students, to generally disrupt the classroom, albeit not intentionally and to impose upon the teacher a burden with which he is not trained to cope. There is therefore sound reason for the distinction made by Section 1375 of the School Code"—Commonwealth's Brief in Support of Motion to Dismiss at 3. (Docket # 22.)

31. N.T. at 164–176. (Hearing of December 15, 1971) (William Ohrtman, cross examination.)

ests of the other members not parties to the adjudication . . ." Rule 23(b) (1) (B). This result follows because (1) intermediate units have an obligation to coordinate the education of exceptional children where member school districts are unable to sustain individual programs, and (2) the Commonwealth, for reasons of economy and administration, must necessarily maintain a uniform set of rules and regulations governing the responsibilities of *all* school districts and intermediate units within the state.[32]

The notice requirements for a (b) (1) class are set forth in Rule 23(d) (2) which provides as follows:

"(d) Orders of Conduct of Actions. In the conduct of actions to which this rule applies, the court may make appropriate orders:

. . . . . .

(2) requiring, for the protection of the members of the class or otherwise for the fair conduct of the action, that notice be given in such manner as the court may direct to some or all of the members of any step in the action, or of the proposed extent of the judgment . . ."

Under this rule, notice of the litigation to members of the class is apparently discretionary, and "[i]n the degree that there is cohesiveness or unity in the class and the representation is effective, the need for notice to the class will tend toward a minimum."[33] Indeed, most courts have held that where a class is adequately represented, no notice of the suit need be given under the Due Process Clause in order to bind all members of the class. See Management T. V. Sys. Inc. v. National Football League, 52 F.R.D. 162 (E.D.Pa.1971); Northern Natural Gas Co. v. Grounds, 92 F.Supp. 619.[34]

But we need not go this far, because the due process issue presented here is significantly different. In this case, the Lancaster-Lebanon Unit, and all 29 other intermediate units and 569 school districts received *two* notices of this proceeding and *two* opportunities to appear before this Court (November 12th and December 15th) *prior* to any final judgment on the fairness of the settlement proposals. And at these hearings, the defendants had an opportunity to recall any expert witness who testified at the August 12th hearing (at which the objectors were not present) for purposes of cross examination. Yet the defendants declined this invitation. In addition, we allowed them an opportunity to present contrary evidence on the merits, and the objecting defendants did produce the testimony which they felt was relevant. All then rested on the record.[35] Since the defendants had an adequate notice to appear and a meaningful opportunity to present evidence *before* we rendered final judgment on the settlement, we hold that the objecting defendants were afforded every element of procedural due process. See Armstrong v. Manzo, 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965).

Further, we are satisfied that the Attorney General adequately represented the interests of all the defendants before the objectors entered the case. To the extent that inadequate representation

---

32. The defendant class may also properly fall 23(b) (2) which requires that:
    "the party opposing the class [of defendants] i. e. the plaintiff class] has acted or refused to act on grounds generally applicable to the class [of defendants] [e. g. the plaintiffs have acted in such a way that the defendants are excluding them from public schools] making appropriate final injunctive relief or corresponding declaratory relief with respect to the class of [of defendants] as a whole."

33. Advisory Committee's Note of 1966. See generally, Moore's Federal Practice § 23.72.

34. But see Eisen v. Carlisle & Jacquelin, 391 F.2d 555 (2nd Cir. 1968), criticized Moore's Federal Practice, § 23.72.

35. N.T. at 78 (Hearing of November 12, 1971); N.T. at 368 (Hearing of December 16, 1971).

during the early stages of litigation might constitute a denial of due process,[36] no such denial occurred in this case. By express agreement of counsel, the Attorney General assumed the arduous task of defending this action on behalf of the thirteen named school districts as well as the named officials. And the interests of these named school districts fairly reflected the interests of all school districts in the Commonwealth. Hence, the requirement that the class representatives not have interests antagonistic to those of other members of the class whom they are representing was satisfied.

We have already reviewed the actions of the Attorney General in defending this case. And while conducting their defense, the Commonwealth kept the named parties fully informed of the progress of the litigation and advised them of the content of the proposed settlements.[37] Considering these facts, we reject Lancaster-Lebanon's attacks upon our jurisdiction over the parties.

### C. *Over the Subject Matter*

Although no party questions the quality of plaintiffs' constitutional claims, it is basic constitutional law that federal district courts cannot acquire jurisdiction over the subject matter of a dispute by consent. Rather our jurisdiction (power) necessarily depends upon the United States Constitution and Acts of Congress. For this reason, consensus of the parties cannot interfere with our fundamental obligation to act only where the Constitution and Congress permit. Cf. Sibron v. New York, 392 U.S. 40, 58,

88 S.Ct. 1889, 20 L.Ed.2d 917 (1968); Young v. United States, 315 U.S. 257, 258–259, 62 S.Ct. 510, 86 L.Ed. 832 (1942). Consequently, we conclude that this court has a constitutional obligation to examine the record independently and satisfy ourselves that plaintiffs' claims are not "wholly insubstantial and frivolous." Bell v. Hood, 327 U.S. 678, 682–683, 66 S.Ct. 773, 90 L.Ed. 939 (1946).

Such an inquiry becomes particularly important in the case of these defendants because we have entered an injunction which, by its terms, binds *all* school districts and intermediate units in the Commonwealth. Moreover, this injunction affects the enforcement of some half-dozen statutes by state officers. The injunctive power of this court must not be used lightly, especially when it operates against state statutes and officers.

We begin with the contention that due process requires a hearing before retarded children may be denied a public education. It is not disputed that prior to this suit, parents of retarded children who are plaintiffs were not afforded a hearing or, in many instances, even notice of their child's exclusion from public school.[38] For example, the parents of David Tupi, a retarded child, were never officially informed of the decision to exclude him from school. Rather they were only made aware of the situation when the school bus which regularly brought him to school failed to show up.[39] Such crass and summary treatment of these children becomes suspect, we think, because of the stigma which our society unfortunately attaches to the label of mental retardation.[40] Dr. Gold-

36. See Moore's Federal Practice § 23.55.

37. See Statement of Representation by the Attorney General—Docket No. 98.

38. Statement of Uncontested Facts, Paragraph #145 at 27. *All* of the defendants are bound by this statement. At the December 15th hearing, we afforded the objectors two weeks to challenge any part of the uncontested facts (which were prepared by the Attorney

General and the plaintiffs). Yet no objector requested a hearing at the expiration of the two weeks period.

39. Statement of Uncontested Facts, Paragraph 90, at 18.

40. See generally M. Garrison, Jr. and D. Hammill, "Who Are the Retarded," Exceptional Children, October 9, 1971; J. Mercer, The Use and Misuse of Labelling Human Beings: The Ethics of Testing,

berg testified at length concerning the historical roots of the stigma.[41]

Organized efforts to educate the mentally retarded began about 1848 with the establishment of residential centers which were geared toward preparing mentally retarded individuals for a greater contribution to society as well as sheltering these individuals from a hostile society. About 1900, special education classes for the mentally retarded were started in public schools. These classes were originally denominated "opportunity classes," which indicated that the child was merely waiting somewhere to join the mainstream of the school life.

But Dr. Goldberg stated that in the next decade:

"[T]he wonderful idea of adjusting the individuals to our society became the dumping grounds for children who could not manage in other classes and started to be called classes for the feebleminded, classes for idiots, and so on   .   .   .   .

And then the Eugenic Association in the United States started to raise quite of lot of cry that the American Society is going to pieces, mental retardation is hereditary, mentally retardeds are criminals, are prostitutes as the [I.Q.] tests proved. Therefore, something very drastic has to be done.

And in 1912, the Eugenic Society, the Research Section of the Eugenic Society, namely, the American Breeders Association suggested that drastic measures be taken to prevent the Americans from becoming all feebleminded [such as] segregation or segregation during the reproductive period, for women,   .   .   .   organizing institutions for feebleminded women of child-bearing age in order to prevent them from having children,   .   .   .   compulsory sterilization law for women, and castration for men.   .   .   .   Another recommendation was euthanasia. This, of course, just introduced and I hope was not implemented.[42]   .   .   . I really want to point out that the days we are talking about are not so far removed, that the stigma attached to mental retardation is still with us, with the general public."[43]

unpublished essay presented at an International Symposium on Human Rights, Retardation and Research, Washington, D.C. (1971); President's Committee, Mental Retardation 1969 Annual Report; N.T. at 8 (Hearing of August 12, 1971) (Ignacy Goldberg.)

41. N.T. at 10–15 (Hearing of August 12, 1971). The historical summary which follows is a paraphrased summary of his testimony.

42. In Buck v. Bell, 274 U.S. 200, 207, 47 S.Ct. 584, 585, 71 L.Ed. 1000 (1926), Justice Oliver Wendell Holmes upheld the validity of Virginia's compulsory sterilization law with these words:

"We have seen more than once that the public welfare may call upon the best citizens for their lives. It would be strange if it could not call upon those who already sap the strength of the State for these lesser sacrifices, often not felt to be such by those concerned, in order to prevent our being swamped with incompetence. It is better for all the world, if instead of waiting to execute degenerate offspring for crime, or to let them starve for their imbecility,

society can prevent those who are manifestly unfit from continuing their kind.   .   .   . Three generations of imbeciles are enough."

The Pennsylvania legislature passed the first such sterilization law in the United States in 1905, but the Governor vetoed it. See Challener, The Law of Sexual Sterilization in Pennsylvania, 57 Dick.L. Rev. 298 (1952). During the next decade after Buck v. Bell, twenty states passed sterilization statutes. See Note, Human Sterilization, 35 Iowa L.Rev. 251, 253 n. 12 (1950). During the last thirty years, thirty-two states have had sterilization statutes but five have been declared unconstitutional. O'Hare and Sanks, Eugenic Sterilization, 45 Geo.L.J. 30 (1956). See generally, F. Lindman and D. McIntyre, The Mentally Disabled and the Law (1961).

43. N.T. at 11–12 (Hearing of August 12, 1971). Dr. Goldberg went on to outline the progress in education of retarded children since the 1920's. He particularly emphasized the progress made during the 1960's, but reminded us that the stigma remains.

Empirical studies show that stigmatization is a major concern among parents of retarded children. Some parents liken it to a "sentence of death." [44]

Experts agree that it is primarily the *school* which imposes the mentally-retarded label and concomitant stigmatization upon children, either initially or later on through a change in educational assignment. This follows from the fact that the school constitutes the first social institution with which the child comes into contact. [45]

Not only is the school the institution which normally imposes the stigma; sometimes, and perhaps quite often, a child is incorrectly labeled. A recent study of 378 educable mentally retarded students from 36 independent school districts in the five county Greater Philadelphia Area found that "the diagnosis for 25% of the youngsters found in classes for the [educable mentally] retarded may be considered erroneous. An additional 43% may be questioned." [46] The authors conclude: "[O]ne cannot help but be concerned about the consequences of subjecting these children to the 'retarded' curriculum . . . . The stigma of bearing the label 'retarded' is bad enough, but to bear the label when placement is questionable or outright erroneous is an intolerable situation." [47]

In the recent case of Wisconsin v. Constantineau, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971), the United States Supreme Court considered the necessity of a due process hearing before the state stigmatizes any citizen. There the police, without notice to her or a prior hearing, had posted a notice in all retail liquor establishments forbidding sales to Mrs. Constantineau because of her "excessive drinking." The Court wrote:

> "The only issue present here is whether the label or characterization given a person by 'posting,' though a mark of serious illness to some, is to others such a stigma or badge of disgrace that procedural due process requires notice and an opportunity to be heard. We agree with the district court that the private interest is such that those requirements . . . must be met." *Id.* at 436, 91 S.Ct. at 509.

Considering just *Constantineau* and the evidence presented here, we are convinced that the plaintiffs have established a colorable claim under the Due Process Clause. [48]

44. J. Mercer, The Use and Misuse of Labelling Human Beings: The Ethics of Testing, *supra* note 35 at 6.

45. Id. at 2; J. Cohen, Vocational Rehabilitation of the Mentally Retarded, Pediatric Clinics of North America, Vol. 15, No. 4 (November 1968) at 1017; N.T., *passim* (Hearing of August 12, 1971).

46. M. Garrison, Jr. and D. Hammill, Who are the Retarded, *supra* note 40 at 18.

47. *Id.* at 20. Dr. Lester Mann who is Special Educator and School Psychologist in Montgomery County estimated that a "significant error" in terms of measurement psychological tests would occur on the average in 5% of the cases. (See N.T. at 296—Hearing of December 16, 1971). The higher figures in the Philadelphia study may be due to the fact that it was conducted in an urban center as well as the fact that Garrison and Hammill employed five different measures in their tests.

48. For this reason we need not consider the colorability of plaintiffs' claim that education constitutes an essential interest, and therefore it may not be disturbed by government action without a prior hearing. See, e. g., Wasson v. Towbridge, 382 F.2d 807 (2nd Cir. 1967); Woods v. Wright, 334 F.2d 369 (5th Cir. 1964); Dixon v. Alabama State Board of Education, 294 F.2d 150 (5th Cir. 1961); Stricklin v. Regents of Univ. of Wisconsin, 297 F.Supp. 416 (W.D.Wis.1969). See also, Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (public assistance benefits); Sniadich v. Family Finance Corp., 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969) (prejudgment garnishment); Schware v. Board of Bar Examiners, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957) (right to take bar examination); Slochower v. Board of Higher Education, 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692 (1956) (dismissal from employment); Goldsmith v. United States Board of Tax

Our jurisdiction over plaintiffs' equal protection claims also stands on firm ground. Without exception, expert opinion indicates that:

"[A]ll mentally retarded persons are capable of benefitting from a program of education and training;[49] that the greatest number of retarded persons, given such education and training, are capable of achieving self-sufficiency and the remaining few, with such education and training are capable of achieving some degree of self-care;[50] that the earlier such education and training begins, the more thoroughly and the more efficiently a mentally retarded person will benefit from it[51] and, whether begun early or not, that a mentally retarded person can benefit at any point in his life and development from a program of education."[52] Consent Agreement, Paragraph 4.

Despite this evidence and despite the fact that Pennsylvania provides an education to most children, the State's 1965 Pennsylvania Mental Retardation Plan estimates that while 46,000 school age retarded children were enrolled in public schools, another 70,000 to 80,000 retarded children between the ages of 5 and 21 were denied access to *any* public education services in schools, home or day care or other community facilities, or state residential institutions (C.M.R.P. at 4, 92, 93, 142).[53]

Because of an absence of adequate resources, facilities and teachers as well as the lack of a structured plan, even those whom the State serves in its institutions (i. e., residential centers, hospitals, etc.) do not always benefit. For example, Dr. Edward R. Goldman, Commissioner of the Office of Mental Retardation, Department of Welfare, testified that there are presently 4,159 children of school age in state institutions. But only 100 of these children are in a full program of education and training; 1,700 are in partial but inadequate programs, and 3,259 are in no program of any kind.[54]

Appeals, 270 U.S. 117, 46 S.Ct. 215, 70 L.Ed. 494 (1926) (accountant's qualifications to practice before the Board of Tax Appeals).

49. N.T. at 18 (Goldberg), 63 (Gallagher), 115 (Steadman), 137 (Blatt) (Hearing of August 12, 1971); N.T. at 248 (Mann) (Hearing of December 16, 1971).

50. N.T. at 668–68 (Gallagher).
The President's Committee on Mental Retardation in its 1969 Annual Report at 17 estimates that "[S]ome three-quarters of this nation's retarded people could become self-supporting if given the right kind of training early enough. Another 10 to 15 percent could become partially self-supporting."
Dr. Aubrey J. Yates in Behavior Therapy (1970) at 234 states that "[T]wo-thirds and probably four-fifths of those who might on I.Q. be classified as feeble minded can live in financial and social independence under present economic circumstances." See generally, President's Committee on Mental Retardation, These Too, Must be Equal; J. Cohen, Vocational Rehabilitation of the Mentally Retarded, supra note 35.

51. N.T. at 30 (Goldberg), 73 (Gallagher), (Hearing of August 12, 1971). See generally, CEC Policy Statement, Journal of Exceptional Children 423–24 (February 1971); President's Committee on Mental Retardation, 1969 Annual Report; 1965 Pennsylvania Mental Retardation Plan; President's Committee on Mental Retardation, The Six Hour Retarded Child (1970).

52. N.T. at 30 (Goldberg) (Hearing of August 12, 1971).

53. See Statement of Uncontested Facts (Paragraph 148) at 30–31. Most estimates of incidence of mental retardation indicate that about 50,000 mentally retarded children are excluded from any education in the Commonwealth today. See, e. g. D. Stedman and D. Sherwood; Hypothetical Community, Average Incidence of Mental Retardation Based on 1965 Census Figures in Four Populations 100,000 People (1967). Although Section 13–1372 of the School Code requires that *every* district superintendent report to the proper intermediate unit on every exceptional child in his district, no such census is now attempted or completed. (See Statement of Uncontested Facts, paragraph 148 n. 1 at 31). Consequently, experts can only guess how many children are presently excluded.

54. N.T. at 65–66 (Hearing of December 15, 1971).

Moreover, the 1965 Pennsylvania Mental Retardation Plan reports that because of a lack of space, the State housed 900 mentally retarded persons at Dallas State Correction Institution, 3,462 at State mental hospitals and 104 in Youth Development Centers. And:

"Fewer than two percent of the residents of Pennsylvania's state schools leave the rolls each year; and half of those by death, rather than by discharge. A discharge rate of less than one percent has two implications: First, that beds are not opening up for persons in the community who need them; and second, that the state institutions continue to provide a program that barely rises above purely custodial care, if it rises at all." [55]

Finally, the Report concludes:

"Nowhere is there a suitable commonwealth-supported local program for children of school age who are adjudged uneducable and untrainable by the public schools. Their normal fate is a waiting list for a state school and hospital, at which services do not conform to the spirit of the school code.[56]

With these facts in mind, we turn to plaintiffs' equal protection argument. Plaintiffs do not challenge the separation of special classes for retarded children from regular classes or the proper assignment of retarded children to special classes. Rather plaintiffs question whether the state, having undertaken to provide public education to some children (perhaps all children) may deny it to plaintiffs entirely. We are satisfied that the evidence raises serious doubts (and hence a colorable claim) as to the existence of a rational basis for such exclusions. See, e. g., Brown v. Board of Education, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955).

One further jurisdictional matter remains. Plaintiffs' complaint contains two pendent state law claims which the Consent Agreement and our Injunction encompass. We find that, to the extent these claims involve distinct non-federal claims,[57] this Court has jurisdiction over them because "[t]he state and federal claims . . . derive from a common nucleus of operative fact" and they are such that "[a plaintiff] would ordinarily be expected to try them all in one judicial proceeding." United Mine Workers v. Gibbs, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). Compare Hurn v. Oursler, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148 (1933). On the other hand, to the extent that these claims emanate from unconstitutional *results* obtained by the improper use of statutes which themselves are not unconstitutional, plaintiffs, of course, have made out a federal claim. See 42 U.S.C. § 1983.[58]

---

55. 1965 Pennsylvania Mental Retardation Plan at 39.

56. *Id.* at 93.

57. In this case, Sections 1326 and 1330 are challenged primarily under State law while Sections 1375 and 1304 are attacked separately under the federal Constitution.

58. We also note that it remains within our discretion to adjudicate these state matters (and the question of unconstitutional results obtained under state statues) *as a three-judge court* since other claims in this suit clearly demand such a court. See Rosado v. Wyman, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970); Florida Lime etc. Growers v. Jacobsen, 362 U.S. 73, 80 S.Ct. 568, 4 L.Ed.2d 568 (1960); Spencer v. Kugler, 454 F.2d 839 (3rd Cir. 1972) (Aldisert, J.). Consequently, we have not exceeded our jurisdiction by encompassing all of plaintiffs' claims within our Order and Injunction.

Some question may arise as to our jurisdiction to enjoin the defendants from denying plaintiffs tuition or tuition maintenance under Section 1376; homebound instruction under Section 1372(3), or preschool education under Sec. 1371(1) since these matters were not expressly included in the pleadings. However, we believe that a compromise under Rule 23 may include related claims not actually pleaded in the action, and for this reason the power exists to enforce these three parts of the Consent Agreement. See Winkelman v. General Motors Corp., 48 F.Supp. 490 (S.D.N.Y.1942). In any case, with leave of court, plaintiffs could simply amend their complaint.

## II. ABSTENTION

■ Lancaster-Lebanon vigorously contends that we should abstain, and stay our hand until the Pennsylvania courts decide whether the Constitution and laws of Pennsylvania already afford plaintiffs the rights they seek to establish in this federal suit. For the reasons discussed below, which are somewhat unique in the history of the doctrine of abstention, we decline to abstain in this case.

■ We begin with the cardinal, yet often forgotten proposition that abstention is an equitable, not a jurisdictional doctrine. See, e. g., Railroad Com'n v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). Hence, sound discretion within the confines of judicial precedent controls our decision.

■ Preliminarily, we must once again consider whether Lancaster-Lebanon can even raise this doctrine at a hearing on the proposed settlement of a class action. As previously indicated, such hearings are traditionally limited to the issues of the fairness of the proposed settlement or other matters expressly involving Rule 23. And an opportunity to object is extended primarily so that those who appear might offer the court, which acts as a guardian to absent class members, advice on the worth of the settlement agreement. Moreover, since the theoretical basis of class actions assumes that all members are bound by the legal strategies of those representing the class (provided such representation is adequate), we think that Rule 23 precludes Lancaster-Lebanon from raising the issue of abstention. Nevertheless, because abstention involves important considerations of federal-state relations, we have decided to entertain it in this case.

■ The doctrine of abstention applies in narrow circumstances where a decision concerning a question of state law might be adequate to dispose of the case or may change the precise nature of the constitutional questions presented, and the answer to the state question in-volves unclear state law. See Askew v. Hargrave, 401 U.S. 476, 91 S.Ct. 856, 28 L.Ed.2d 200 (1971); Reetz v. Bozanich, 397 U.S. 82, 90 S.Ct. 788, 25 L.Ed.2d 68 (1970); Harman v. Forssenius, 380 U.S. 528, 534, 85 S.Ct. 1177, 14 L.Ed.2d 50 (1965); Railroad Com'n of Texas v. Pullman Co., supra; Gere v. Stanley, supra. The rationale behind this rule is twofold. First, by abstaining, the federal court avoids needless, or at least, premature constitutional adjudication. Secondly, it avoids needless friction in federal-state relations. This second consideration becomes particularly weighty where a matter of paramount interest to the state, requiring local expertise to resolve, is involved. See, e. g., Railroad Com'n of Texas v. Pullman, supra; Burford v. Sun Oil Co., 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943).

■ Where there is no question of unclear state law, however, a federal court may *not* abstain merely because (1) state courts are as competent a forum to decide federal questions as are the federal courts, See Wisconsin v. Constantineau, supra; Zwickler v. Koota, 389 U.S. 241, 248, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967); Gere v. Stanley, supra, 453 F.2d at 208–209; or (2) paramount state interests are challenged in the suit, See, King-Smith v. Aaron, 455 F.2d 378 n. 3 (3rd Cir. 1972); Garvin v. Rosenau, 455 F.2d 233 (6th Cir. 1972). With this view of abstention in mind, we turn to the facts of this case.

It is easiest to understand the abstention issue if we first assume that no Consent Agreement had been presented to the Court. In that event, plaintiffs' complaint would have divided neatly into two parts—due process (procedural) and equal protection (substantive).

As to the due process claim, the statutes challenged are clear; they simply make no provision for hearings for retarded children prior to exclusion from school or a change in educational assignment. Consequently, it would have been improper for us to abstain on this issue. See Wisconsin v. Constantineau, supra.

The equal protection claim, however, requires closer scrutiny. The statutes challenged under this Clause (1375 and 1304) as well as those challenged under pendent state law (1330 and 1326) are all unclear, and as yet, uninterpreted by Pennsylvania Courts.[59] Indeed, the very fact that the Attorney General of the Commonwealth was able to construe these statutes so as to eliminate the alleged equal protection claims dispels any doubt about whether the statutes are capable of saving interpretations. Moreover, Article III, Section 14 of the Pennsylvania Constitution [60] may already afford plaintiffs their requested relief.[61] Undoubtedly proper judicial procedure requires that a federal court allow the state courts to face these state law issues before allowing an attack on federal constitutional grounds in the federal court. Hence, assuming that no Consent Agreement was presented, we would have been faced with an unusual situation—divisible abstention—half of the case commanding abstention and the other half requiring a decision. Under these circumstances, primarily because of the distinctiveness of the two issues and the fact that the federal due process claim could not have been avoided on state grounds, it would have been sensible to abstain on the equal protection issue but decide the due process question.[62] Such a severance nicely satisfies both the demand that we accept jurisdiction where properly invoked and the requirement that we avoid needless constitutional decisions on local matters.

Since, in any event, we would not have abstained on the due process claim, the narrow issue before us is whether, given the existence of a final Consent Agreement, we ought now to abstain on the issue of equal protection.[63] Considering the present posture of this suit, we hold that judicial precedent as well as equitable principles dictate against such a disposition.

To recapitulate, the fact that a question of state law adequate to dispose of the case involves unclear state law does not in itself trigger abstention. Rather, the decision to abstain flows ultimately from the fact that the federal court's handling of unclear state law may cause a needless constitutional decision as well as undue friction between the state and federal systems. Consequently, regardless of any unclear state law, if it is possible for federal litigation to go forward without violating either of these underlying precepts, abstention must be regarded as inappropriate. In this case, by approving the Amended Consent Agreement and Stipulation we avoid treading upon either precept.

First, there is no risk of a needless or premature constitutional decision since the settlement itself eliminates the need to make *any* constitutional decisions at all concerning these unclear state statutes. Secondly, we find no risk of friction with the State of Pennsylvania in the administration of its local affairs since the Attorney General, Secretary of Education and Secretary of Welfare, the very officers who are responsible for administering the state's system of education, all affirmatively request that this court retain jurisdiction and *not* abstain.[64]

---

59. Section 1375 (tuition and tuition maintenance), Section 1372(3) (homebound instruction) and Section 1371(1) (preschool education) which the Consent Agreement encompasses are also unclear.

60. See note 9, supra.

61. Article III, Section 14 was adopted in 1967 and has not yet been adequately interpreted by Pennsylvania courts.

62. We express no opinion on the proper disposition where the evidence on both

claims is the same, and hence the issues are not easily separated.

63. We point out that this issue differs from the issue discussed above, which was, what might have been done with this case if the defendants had pressed the abstention issue from the beginning or if no settlement effort had been undertaken.

64. N.T. at 58–59. (Hearing of February 7th, 1972). See also Corporation of Haverford College v. Reeher, 329 F.

Equitable considerations are equally strong against abstention. We have held a half dozen hearings over the last year. We have heard from international experts in the field of education of retarded children. We have heard from local experts on the administrative and legal problems. On the basis of their combined expertise, the Consent Agreements were formulated. Indeed, the Director of the Bureau of Special Education for the Commonwealth testified that he personally reviewed the October 7th Agreement "word by word, phrase by phrase." [65] And he worked through more than six drafts.[66] Likewise, the Commissioner of the Office of Mental Retardation, Department of Welfare, testified that he assigned one employee to work full time on the Agreement.[67] In short, the Consent was not drawn up by a remote federal court, rather it was prepared in large part by the most talented local experts in the Commonwealth, the defendants themselves. Certainly no state court could hope for more expertise in these matters than that supplied by the defendants in this case.

Furthermore, the plan which the Consent Agreement contemplates, which may make possible for many of the plaintiffs a life of dignity and meaning, is well on its way toward becoming a reality. The Masters have already expended much time and energy, and they have held several meetings in this Courthouse. Many school districts have begun the task of locating members of the plaintiff class. With all these wheels in motion, no useful purpose

would be served by the court abstaining at this juncture.[68]

## III. FAIRNESS OF THE SETTLEMENT

■ The final matter for our consideration is whether to approve the settlement as fair and reasonable. In arriving at such a decision, we must consider its fairness to both the plaintiffs and the defendants since both groups are classes for which this Court assumes the role of guardian.

Additionally, we must dispose of the objections of the Pennsylvania Association of Private Schools for Exceptional Children (PAPSEC). Essentially, PAPSEC contends that the following paragraph is unjust *to retarded children* in private schools because it eliminates the requirement for a prior hearing.[69]

"Whenever an additional facility or program within a School District or Intermediate Unit is submitted for approval by the Secretary of Education, then at the same time, a School District or Intermediate Unit, upon written notice to the parent or guardian, may in writing request approval of the Director of the Bureau of Special Education, acting as the Secretary's designee, for the transfer of particular children from private schools to the additional facility or program. Any district or unit so requesting shall submit documentation of the appropriateness of the new facility or program for the particular children proposed for transfer. The parents or guardians may submit any documenta-

Supp. 1196, 1201 (E.D.Pa.1971) (Joseph S. Lord, III, C. J.).

65. N.T. at 29 (William Ohrtman) (Hearing of December 5, 1971).

66. *Id.* at 28.

67. *Id.* at 73. (Edward Goldman).

68. Lancaster-Lebanon relies primarily upon Reid v. Board of Education of New York City (2nd Cir. 1972) and, of course, *Reetz* and *Askew*. In *Reid* the Second Circuit argued that the district court should abstain from deciding whether a delay of over two years between the

testing and placement of brain-damaged children in public schools, with no educational services extended in the interim, violated the federal Constitution. But *Reid*, like so many other cases including *Reetz* and *Askew*, is distinguishable because the case before us (1) involves a settlement agreement which obviates the need to decide constitutional issues and (2) the Commonwealth has requested that we not abstain, thereby obviating the threat of federal-state irritation.

69. N.T. at 3–6. (Hearing of February 7, 1972).

tion to the contrary. If after appropriate investigation the Director of the Bureau certifies the new facility or program as appropriate for those children and approves their transfers, such certification and approval shall be in lieu of individual hearings as provided above in this paragraph." Amended Consent Agreement, Paragraph 29.

However, since PAPSEC is neither a party nor a member of either class, we must first decide whether it has standing to raise this issue.

■ To confer standing under the rules of Flast v. Cohen, 392 U.S. 83, 102, 88 S.Ct. 1942, 1953, 20 L.Ed.2d 947 (1968), a party must not only establish a personal stake and interest in the outcome, it must also show "a logical nexus between the status [it asserts] and the claim sought to be adjudicated." In this case PAPSEC members no doubt have a genuine financial stake in the outcome since the Consent Agreement (particularly paragraph 29) may well tend to curtail the expansion of private schools for retarded children. However, they raise no issues relating to the welfare of private schools under the settlement. Rather PAPSEC seeks only to advance the interests and welfare of retarded children. It is not clear whether PAPSEC may do this under the doctrine of Flast v. Cohen. Compare Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) where the Society of Sisters alleged both a denial of their constitutional rights by a state statute which outlawed private schools as well as a denial of the constitutional rights of their patrons. But we need not decide this issue because, even if we were to consider the interests of retarded children under this paragraph of the Consent, we are convinced that it is fair to them. In this instance, certification by the Director of the Bureau of Education, the opportunity of parents to participate in determining the facility's appropriateness and automatic re-evaluation every two years are sufficient safeguards against an erroneous assignment.

■ Next, we consider the defendants, particularly the local districts and intermediate units which comprise the vast bulk of this class. When the objectors entered this case, they expressed alarm at the possible burdens, both administrative and financial, which the due process Stipulation and the Consent Agreement would impose. Subsequent changes in the due process Stipulation, however, eliminated most of the administrative burden, and that allayed the fears of all but the Lancaster-Lebanon Unit.

Lancaster-Lebanon continues to object to the basic concept of a prior due process hearing and asserts that injury flows to the school districts because under the Stipulation they will be unable to remove a disruptive retarded child from regular classes immediately. But this danger is more imagined than real. Dr. Sherr, Lancaster-Lebanon's own witness testified that the problem would arise, if at all, only with respect to severely retarded children. As to that group identification is rather easy; and an early identification, as required by state law, will permit a hearing and decision (if there is a dispute) well before the school year begins.[70] In any case, the Amended Stipulation on hearings provides that in "extraordinary circumstances" the Director of the Bureau of Special Education may authorize tentative assignment to precede the hearing.[71]

Financially, the burden of implementing this settlement falls primarily upon the Commonwealth, not the local districts or intermediate units. Dr. Ohrtman testified that the excess instruction cost required to educate a retarded child will be paid for by the Commonwealth. For example, he stated that if it costs $1,000

---

70. N.T. at 62–68 (Hearing of November 12, 1971).

71. Amended Stipulation, Paragraph 3(v).

to educate a normal child and $1,800 for a retarded child, the State will reimburse $800 to the local district.[72] Moreover, the Commonwealth will pay intermediate units, in advance, funds necessary to hire extra personnel such as secretaries and psychologists necessary to implement this settlement.[73] In short, we ·find that both the Stipulation and Consent Agreement are fair and reasonable to the defendants.

We have absolutely no hesitation about approving the Agreements as fair and reasonable to the plaintiffs. Approval means that plaintiff retarded children who heretofore had been excluded from a public program of education and training will no longer be so excluded after September 1, 1972. This is a noble and humanitarian end in which the Commonwealth of Pennsylvania has chosen to join. Today, with the following Order, this group of citizens will have new hope in their quest for a life of dignity and self-sufficiency.

## ORDER AND INJUNCTION

And now, this 5th day of May, 1972, it is ordered that the Amended Stipulation and Amended Consent Agreement are approved and adopted as fair and reasonable to all members of both the plaintiff and defendant classes.

It is further ordered that the defendants; the Commonwealth of Pennsylvania, the Secretary of the Department of Education, the State Board of Education, the Secretary of the Department of Public Welfare, the named defendant school districts and intermediate units and each of the school districts and intermediate units in the Commonwealth of Pennsylvania, their officers, employees, agents and successors are enjoined as follows:

(a) from applying Section 1304 of the Public School Code of 1949, 24 Purd.

Stat. Sec. 1304, so as to postpone or in any way deny to any mentally retarded child access to a free public program of education and training;

(b) from applying Section 1326 or Section 1330(2) of the School Code of 1949, 24 Purd.Stat. Secs. 13–1326 and 13–1330(2) so as to postpone, to terminate or in any way deny to any mentally retarded child access to a free program of education and training;

(c) from applying Section 1371(1) of the School Code of 1949, 24 Purd.Stat. Sec. 13–1371(1) so to deny to any mentally retarded child access to a free public program of education and training;

(d) from applying Section 1376 of the School Code of 1949, 24 Purd.Stat. Sec. 13–1376, so as to deny tuition or tuition and maintenance to any mentally retarded person except on the same terms as may be applied to other exceptional children, including brain damaged children generally;

(e) from denying homebound instruction under 1372(3) of the School Code of 1949, 24 Purd.Stat. Sec. 13–1372(3) to any mentally retarded child merely because no physical disability accompanies the retardation or because retardation is not a short-term disability.

(f) from applying Section 1375 of the School Code of 1949, 24 Purd.Stat. Sec. 13–1375, so as to deny to any mentally retarded child access to a free public program of education and training;

(g) to provide, as soon as possible but in no event later than September 1, 1972, to every retarded person between the ages of six and twenty-one years as of the date of this Order and thereafter, access to a free public program of education and training appropriate to his learning capacities;

(h) to provide, as soon as possible but in no event later than September 1,

72. N.T. at 21 (Hearing of December 15, 1971).

73. *Id.* at 23.

1972, wherever defendants provide a preschool program of education and training for children aged less than six years of age, access to a free public program of education and training appropriate to his learning capacities to every mentally retarded child of the same age.

(i) to provide notice and the opportunity for a hearing prior to a change in educational status of any child who is mentally retarded or thought to be mentally retarded.

(j) to re-evaluate the educational assignment of every mentally retarded child not less than every two years, or annually upon the parents' request, and upon such re-evaluation, to provide notice and the opportunity for a hearing.

## APPENDIX A

### AMENDED STIPULATION

And now, this 14th day of February, 1972, subject to the approval and Order of the Court, it is agreed by the parties that the Stipulation of June 18, 1971, be amended to provide as follows:

1. *Definitions*

(a) "Change in educational status" shall mean any assignment or re-assignment based on the fact that the child is mentally retarded or thought to be mentally retarded to one of the following educational assignments: Regular Education, Special Education or to no assignment, or from one type of special education to another.

(b) "Department" shall mean the Pennsylvania Department of Education.

(c) "School District" shall mean any school district in the Commonwealth of Pennsylvania.

(d) "Intermediate Unit" shall mean the intermediate units as provided by the Pennsylvania School Code.

(e) "Regular Education" shall mean education other than special education.

(f) "Special Education" shall mean special classes, special schools, education and training secured by the local school district or intermediate unit outside the public schools or in special institutions, instruction in the home and tuition reimbursement, as provided in 24 Purd. Stat. Secs. 13–1371 through 13–1380.

(g) Wherever the word "Parent" is mentioned, it will include the term "Guardian" and the plural of each where applicable.

2. No child of school age who is mentally retarded or who is thought by any school official, the intermediate unit, or by his parents or guardian to be mentally retarded, shall be subjected to a change in educational status without first being accorded notice and the opportunity of a due process hearing as hereinafter prescribed. This provision shall also apply to any child who has never had an educational assignment.

Nothing contained herein shall be construed to preclude any system of consultations or conferences with parents heretofore or hereafter used by School Districts or Intermediate Units with regard to the educational assignment of children thought to be mentally retarded. Nor shall such consultations or conferences be in lieu of the due process hearing.

3. Within 30 days of the approval of this Stipulation by the Court herein, the State Board of Education shall adopt regulations, and shall transmit copies thereof to the superintendents of the School Districts and Intermediate Units, the Members of their Boards, and their counsel, which regulations shall incorporate paragraphs 1 and 2 above and otherwise shall provide as follows:

(a) Whenever any mentally retarded or allegedly mentally retarded child of school age is recommended for a change in educational status by a School District, Intermediate Unit or any school official, notice of the proposed action

shall ·first be given to the parent or guardian of the child.

(b) Notice of the proposed action shall be given in writing to the parent or guardian of the child either (i) at a conference with the parent or (ii) by certified mail to the parent (addressee only, return receipt requested).

(c) The notice shall describe the proposed action in detail, including specification of the statute or regulation under which such action is proposed and a clear and full statement of the reasons therefor, including specification of any tests or reports upon which such action is proposed.

(d) The notice shall advise the parent or guardian of any alternative education opportunities available to his child other than that proposed.

(e) The notice shall inform the parent or guardian of his right to contest the proposed action at a full hearing before the Secretary of Education, or his designee, in a place and at a time convenient to the parent, before the proposed action may be taken.

(f) The notice shall inform the parent or guardian of his right to be represented at the hearing by any person of his choosing, including legal counsel, of his right to examine before the hearing his child's school records including any tests or reports upon which the proposed action may be based, of his right to present evidence of his own, including expert medical, psychological and educational testimony, and of his right to call and question any school official, employee, or agent of a school district, intermediate unit or the department who may have evidence upon which the proposed action may be based.

(g) The notice shall inform the parent or guardian of the availability of various organizations, including the local chapter of the Pennsylvania Association for Retarded Children, to assist him in connection with the hearing and the school district or intermediate unit involved shall provide the address and telephone number of such organization in the notice.

(h) The notice shall inform the parent or guardian that he is entitled under the Pennsylvania Mental Health and Mental Retardation Act to the services of a local center for an independent medical, psychological and educational evaluation of his child and shall specify the name, address and telephone number of the MH–MR center in his catchment area.

(i) The notice shall specify the procedure for pursuing a hearing.

If the notice is given at a conference with the parent, the parent may at that conference indicate his satisfaction with the recommendation and may in writing waive the opportunity for a hearing or, if dissatisfied, may in writing request a hearing. In either event, the parent may within five calendar days of the conference change this decision and may then request or waive the opportunity for a hearing by so indicating in writing to the school district or intermediate unit. If the parental decision is indicated at a conference, the parent shall be given a postcard which shall be mailed to the school district or intermediate unit within five calendar days thereafter, if the parent desires to change the decision. There shall be no change in educational assignment during the five day period.

If notice is given by certified mail, the parent must fill in the form requesting a hearing and mail the same to the school district or intermediate unit within ten (10) days of the date of receipt of the notice.

(j) The hearing shall be scheduled not sooner than fifteen (15) days nor later than thirty (30) days after receipt of the request for a hearing from the parent or guardian, provided however that upon good cause shown, reasonable extensions of these times shall be granted at the request of the parent or guardian.

(k) The hearing shall be held in the local district and at a place reasonably

convenient to the parent or guardian of the child. At the option of the parent or guardian, the hearing may be held in the evening and such option shall be set forth in the form requesting the hearing aforesaid.

(*l*) The hearing officer shall be the Secretary of Education, or a person designated by him acting in his stead, but shall not be an officer, employee or agent of any local district or intermediate unit in which the child resides.

(m) The hearing shall be an oral, personal hearing, and shall be public unless the parent or guardian specifies a closed hearing.

(n) The decision of the hearing officer shall be based solely upon the evidence presented at the hearing.

(*o*) The proposed change in educational status shall be approved only if supported by substantial evidence on the whole record of the hearing. Introduction by the school district or intermediate unit of the official report recommending a change in educational assignment, provided a copy of such report was given to the parent at the time notice was given, shall discharge its burden of going forward with the evidence, thereby requiring the parent to introduce evidence (as contemplated in paragraphs f, r, s, and t herein) in support of his contention.

(p) A stenographic or other transcribed record of the hearing shall be made and shall be available to the parent or guardian or his representative. Said record may be discarded after three years.

(q) The parent or guardian of the child may be represented at the hearing by any person of his choosing, including legal counsel.

(r) The parent or guardian or his representative shall be given reasonable access prior to the hearing to all records of the school district or intermediate unit concerning his child, including any tests or reports upon which the proposed action may be based.

(s) The parent or guardian or his representative shall have the right to compel the attendance of, and to question any witness testifying for the school board or intermediate unit and any official, employee, or agent of the school district, intermediate unit, or the department who may have evidence upon which the proposed action may be based.

(t) The parent or guardian shall have the right to present evidence and testimony, including expert medical, psychological or educational testimony.

(u) No later than twenty (20) days after the hearing, the hearing officer shall render a decision in writing which shall be accompanied by written findings of fact and conclusions of law and which shall be sent by registered mail to the parent or guardian and his representative.

(v) There shall be no change in the child's educational status without prior notice and the opportunity to be heard as set forth herein, except that in extraordinary circumstances the Director of the Bureau of Special Education, upon written request to him by the district or intermediate unit setting forth the parent, may approve an interim change in educational assignment prior to the hearing, in which event the hearing will be held as promptly as possible after the interim change. The Director shall act upon any such request promptly and in any event within three (3) days of its receipt.

(w) Any time limitation herein shall be construed and applied so as to do substantial justice and may be varied upon request and good cause shown.

4. The Department of Education shall revise its regulations to be in accord with the procedures agreed upon herein, shall disseminate the revised regulations to the school districts and intermediate units and shall thereafter file with the court and plaintiffs a statement of how and to whom said regulations and any covering statements were delivered.

5. Notice and the opportunity of a due process hearing, as set out in paragraph 3 above, shall be afforded on and after the effective date of the stipulation to every child who is mentally retarded or who is thought by any school official, the intermediate unit, or by his parents to be mentally retarded, before subjecting such child to a change in educational status as defined herein.

[s] Ed Weintraub
Ed Weintraub
Deputy Attorney General

[s] Thomas K. Gilhool
Thomas K. Gilhool
Counsel for Plaintiffs

APPENDIX B

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

PENNSYLVANIA ASSOCIATION FOR
RETARDED CHILDREN,
NANCY BETH BOWMAN, et al.

Plaintiffs

v.

COMMONWEALTH OF PENNSYLVANIA,
DAVID H. KURTZMAN, et al.

Defendants

CIVIL ACTION
NO. 71–42

AMENDED CONSENT AGREEMENT

The Complaint in this action having been filed on January 7, 1971, alleging the unconstitutionality of certain Pennsylvania statutes and practices under the Equal Protection Clause of the Fourteenth Amendment and certain pendent claims; a three-judge court having been constituted, after motion, briefing and argument thereon, on May 26, 1971; and Order and Stipulation having been entered on June 18, 1971, requiring notice and a due process hearing before the educational assignment of any retarded child may be changed; and evidence having been received at preliminary hearing on August 12, 1971;

The parties being desirous of effecting an amicable settlement of this action, having entered into a Consent Agreement on October 7, 1971, approved by the Court on an interim basis that day, and notice having been given to members of plaintiff and defendant classes and certain objections having been raised by members of the classes, the objections having been heard, and in the particulars set forth below, agreed to, and all but one objection having been withdrawn by the members of the classes.

Now, Therefore, the parties agree this 14th day of February, 1972, subject to the approval and Order of this Court, to the following final amended Consent Agreement.

1. This action may and hereby shall be maintained by plaintiffs as a class action on behalf of all mentally retarded persons, residents of the Commonwealth of Pennsylvania, who have been, are being, or may be denied access to a free public program of education and training while they are, or were, less than twenty-one years of age.

It is expressly understood, subject to the provisions of Paragraph 45 below, that the immediate relief hereinafter provided shall be provided to those persons less than twenty-one years of age as of the date of the Order of the Court herein.

2. This action may and hereby shall be maintained against defendant school

districts and intermediate units as a class action against all of the School Districts and Intermediate Units of the Commonwealth of Pennsylvania.

3. Pursuant to Rule 23, Fed.R.Civ.P., notice of the extent of the Consent Agreement and the proposed Order approving this Consent Agreement, in the form set out in Appendix A, shall be given as follows:

(a) to the class of defendants, by the Secretary of Education, by mailing immediately a copy of this proposed Order and Consent Agreement to the Superintendent and the Director of Special Education of each School District and Intermediate Units in the Commonwealth of Pennsylvania;

(b) to the class of plaintiffs, (i) by the Pennsylvania Association for Retarded Children, by immediately mailing a copy of this proposed Order and Consent Agreement to each of its Chapters in fifty-four counties of Pennsylvania; (ii) by the Department of Justice, by causing an advertisement in the form set out in Appendix A, to be placed in one newspaper of general circulation in each County in the Commonwealth; and (iii) by delivery of a joint press release of the parties to the television and radio stations, newspapers, and wire services in the Commonwealth.

## II.

4. Expert testimony in this action indicates that all mentally retarded persons are capable of benefiting from a program of education and training; that the greatest number of retarded persons, given such education and training, are capable of achieving self-sufficiency, and the remaining few, with such education and training, are capable of achieving some degree of self-care; that the earlier such education and training begins, the more thoroughly and the more efficiently a mentally retarded person will benefit from it; and, whether begun early or not, that a mentally retarded person can benefit at any point in his life and development from a program of education and training.

5. The Commonwealth of Pennsylvania has undertaken to provide a free public education to all of its children between the ages of six and twenty-one years, and further, has undertaken to provide education and training for all of its mentally retarded children.

6. Having undertaken to provide a free public education to all of its children, including its mentally retarded children, the Commonwealth of Pennsylvania may not deny any mentally retarded child access to a free public program of education and training.

7. It is the Commonwealth's obligation to place each mentally retarded child in a free, public program of education and training appropriate to the child's capacity, within the context of the general educational policy that, among the alternative programs of education and training required by statute to be available, placement in a regular public school class is preferable to placement in a special public school class and placement in a special public school class is preferable to placement in any other type of program of education and training.

## III.

*Section 1304*

8. Section 1304 of the School Code of 1949, as amended, 24 Pur.Stat. Sec. 13–1304, provides:

*"Admission of beginners*

The admission of beginners to the public schools shall be confined to the first two weeks of the annual school term in districts operating on an annual promotion basis, and to the first two weeks of either the first or the second semester of the school term to districts operating on a semi-annual promotion basis. Admission shall be limited to beginners who have attained the age of five years and seven months before the first day of September if they are to be admitted in the fall, and to those who have attained the age of five years and seven months before the first day of Febru-

ary if they are to be admitted at the beginning of the second semester. The board of school directors of any school district may admit beginners who are less than five years and seven months of age, in accordance with standards prescribed by the State Board of Education. The board of school directors may refuse to accept or retain beginners who have not attained a mental age of five years, as determined by the supervisor of special education or a properly certificated public school psychologist in accordance with standards prescribed by the State Board of Education.

"The term 'beginners', as used in this section, shall mean any child that should enter the lowest grade of the primary school or the lowest primary class above the kindergarten level."

9. The Secretary of Education, the State Board of Education, the named School Districts and Intermediate Units, each of them, for themselves, their officers, employees, agents, and successors agree that they shall cease and desist from applying Section 1304 so as to postpone or in any way to deny access to a free public program of education and training to any mentally retarded child.

10. The Attorney General of the Commonwealth of Pennsylvania (hereinafter "The Attorney General") agrees to issue an Opinion declaring that Section 1304 means *only* that a school district may refuse to accept into or to retain in the lowest grade of the *regular* primary school or the lowest *regular* primary class above the kindergarten level, any child who has not attained a mental age of five years.

11. The Attorney General of the Commonwealth of Pennsylvania shall issue an Opinion thus construing Section 1304, and the State Board of Education (hereinafter "the Board") shall issue regulations to implement said construction and to supersede Sections 5–200 of the Pupil Attendance Regulations, copies of which Opinion and Regulations shall

be filed with the Court and delivered to counsel for plaintiffs on or before February 28, 1972, and they shall be issued and promulgated respectively on or before March 8, 1972.

12. The aforementioned Opinion and Regulations shall (a) provide for notice and an opportunity for a hearing as set out in this Court's Order of June 18, 1971, as amended, before a child's admission as a beginner in the lowest grade of a regular primary school, or the lowest regular primary class above kindergarten, may be postponed; (b) require the automatic re-evaluation every two years of any educational assignment other than to a regular class, and (c) provide for an annual re-evaluation at the request of the child's parent or guardian, and (d) provide upon each such re-evaluation that the school district or intermediate unit shall give notice and an opportunity for a hearing as set out in this Court's Order of June 18, 1971, as amended, on the findings of the re-evaluation and the appropriateness of the educational assignment based thereon. As used herein and throughout this Agreement the term "re-evaluation" contemplates that degree of analysis and investigation necessary to make a sound judgment as to the appropriateness of the educational assignment of the child thought to be mentally retarded, which in some instances, may involve reviewing existing cumulative data and documentation or, in other instances may involve comprehensive psycho-educational testing.

13. The aforementioned Opinion and Regulations shall also require the timely placement of any child whose admission to regular primary school or to the lowest regular primary class above kindergarten is postponed, or who is not retained in such school or class, in a free public program of education and training pursuant to Sections 1371 through 1382 of the School Code of 1949, as amended 24 Purd.Stat. Sec. 13–1371 through Sec. 13–1382.

*Section 1326*

14. Section 1326 of the School Code of 1949, as amended, 24 Purd.Stat. Sec. 13–1326, provides:

*"Definitions*

The term 'compulsory school age,' as hereinafter used shall mean the period of a child's life from the time the child's parents elect to have the child enter school, which shall be not later than at the age of eight (8) years, until the age of seventeen (17) years. The term shall not include any child who holds a certificate of graduation from a regularly accredited senior high school."

15. The Secretary of Education, the State Board of Education, the named School Districts and Intermediate Units, each of them, for themselves, their officers, employees, agents and successors agree that they shall cease and desist from applying Section 1326 so as to postpone, to terminate, or in any way to deny access to a free public program of education and training to any mentally retarded child.

16. The Attorney General agrees to issue an Opinion declaring that Section 1326 means *only* that parents of a child have a compulsory duty while the child is between eight and seventeen years of age to assure his attendance in a program of education and training; and Section 1326 does not limit the ages between which a child must be granted access to a free, public program of education and training. Defendants are bound by Section 1301 of the School Code of 1949, 24 Purd.Stat. Sec. 13–1301, to provide free public education to all children six to twenty-one years of age. In the event that a parent elects to exercise the right of a child six through eight years and/or seventeen through twenty-one years of age to a free public education, defendants may not deny such child access to a program of education and training. Furthermore, if a parent does not discharge the duty of compulsory attendance with regard to any mentally re-tarded child between eight and seventeen years of age, defendants must and shall take those steps necessary to compel the child's attendance pursuant to Section 1327 of the School Code of 1949, 24 Purd.Stat. Sec. 13–1327, and related provisions of the School Code, and to the relevant regulations with regard to compulsory attendance promulgated by the Board.

17. The Attorney General shall issue an Opinion thus construing Section 1326, and related Sections, and the Board shall promulgate Regulations to implement said construction, copies of which Opinion and Regulations shall be filed with the Court and delivered to plaintiffs' counsel on or before February 28, 1972, and they shall be issued and promulgated respectively on or before March 8, 1972.

*Section 1330(2)*

18. Section 1330(2) of the School Code of 1949, as amended, 24 Purd.Stat. Sec. 13–1330(2) provides:

*"Exceptions to compulsory attendance.*

The provisions of this act requiring regular attendance shall not apply to any child who—

\*      \*      \*      \*      \*      \*

(2) Has been examined by an approved mental clinic or by a person certified as a public school psychologist or psychological examiner, and has been found to be unable to profit from further public school attendance, and who has been reported to the board of school directors and excused, in accordance with regulations prescribed by the State Board of Education."

19. The Secretary of Education, the State Board of Education, the named School Districts and Intermediate Units, each of them, for themselves, their officers, employees, agents, and successors agree that they shall cease and desist from applying Section 1330(2) so as to terminate or in any way to deny access to a free public pro-

gram of education and training to any mentally retarded child.

20. The Attorney General agrees to issue an Opinion declaring that Section 1330(2) means *only* that a parent may be excused from liability under the compulsory attendance provisions of the School Code when, with the approval of the local school board and the Secretary of Education and a finding by an approved clinic or public school psychologist or psychological examiner, the parent elects to withdraw the child from attendance. Section 1330(2) may not be invoked by defendants, contrary to the parents' wishes, to terminate or in any way to deny access to a free public program of education and training to any mentally retarded child.

21. The Attorney General shall issue an Opinion so construing Section 1330(2) and related provisions and the Board shall promulgate Regulations to implement said construction and to supersede Section 5–400 of the Pupil Attendance Regulations, a copy of which Opinion and Regulations shall be filed with the Court and delivered to counsel for plaintiff on or before February 28, 1972, and they shall be issued and promulgated respectively on or before March 8, 1972.

*Pre-School Education*

22. Defendants, the Commonwealth of Pennsylvania, the Secretary of Education, the State Board of Education, the named School Districts and Intermediate Units, and the Secretary of Public Welfare, each of them, for themselves, their officers, employees, agents, and successors agree that they shall cease and desist from applying Section 1371(1) of the School Code of 1949, as amended, 24 Purd.Stat. Sec. 13–1371(1) so as to deny access to a free public program of education and training to any mentally retarded child, and they further agree that wherever the Department of Education through its instrumentalities, the School Districts and Intermediate Units, or the Department of Public Welfare through any of its in-

strumentalities provides a pre-school program of regular education and training to children below the age of six, they shall also provide a program of education and training appropriate to their learning capacities to all retarded children of the same age.

23. Section 1371(1) of the School Code of 1949, as amended, 24 Purd.Stat. Sec. 13–1371(1), provides:

*"Definition of exceptional children; reports; examination*

(1) The term 'exceptional children' shall mean children of school age who deviate from the average in physical, mental, emotional or social characteristics to such an extent that they require special educational facilities or services and shall include all children in detention homes."

24. The Attorney General agrees to issue an Opinion declaring that the phrase "children of school age" as used in Section 1371 means children aged six to twenty-one and also, whenever the Department of Education through any of its instrumentalities, the local School District, Intermediate Unit, or the Department of Public Welfare, through any of its instrumentalities, provides a pre-school program of regular education and training for children below the age of six, whether kindergarten or however so called, means all mentally retarded children who have reached the age less than six at which such pre-school programs are available to others.

25. The Attorney General shall issue an Opinion thus construing Section 1371 and the Board shall issue regulations to implement said construction, copies of which Opinion and Regulations shall be filed with the Court and delivered to counsel for plaintiffs on or before February 28, 1972, and they shall be issued and promulgated respectively on or before March 8, 1972.

*Tuition and Tuition and Maintenance*

26. The Secretary of Education, the State Board of Education, the named School Districts and Intermediate Units, each of them, for themselves, their offi-

cers, employees, agents and successors agree that they shall cease and desist from applying Section 1376 of the School Code of 1949, as amended, 24 Purd.Stat. Sec. 13–1376, so as to deny tuition or tuition and maintenance to any mentally retarded person.

27. The Attorney General agrees to issue an Opinion, and the Council of Basic Education of the State Board of Education agrees to promulgate Regulations, construing the term "brain damage" as used in Section 1376 and as defined in the Board's "Criteria for Approval . . . of Reimbursement" so as to include thereunder all mentally retarded persons, thereby making available to them tuition for day school and tuition and maintenance for residential school up to the maximum sum available for day school or residential school, whichever provides the more appropriate program of education and training. Copies of the aforesaid Opinion and Regulations shall be filed with the Court and delivered to counsel for plaintiff on or before February 28, 1972, and they shall be issued and promulgated respectively on or before March 8, 1972.

28. Defendants may deny or withdraw payments of tuition or tuition and maintenance whenever the school district or intermediate unit in which a mentally retarded child resides provides a program of special education and training appropriate to the child's learning capacities into which the child may be placed.

29. The decision of defendants to deny or withdraw payments of tuition or tuition and maintenance shall be deemed a change in educational assignment as to which notice shall be given and an opportunity for a hearing afforded as set out in this Court's Order of June 18, 1971, as amended. The issue at such hearing shall be whether the School District or Intermediate Unit provides an appropriate program of education and training for the particular child.

Whenever an additional facility or newly created program within a School District or Intermediate Unit is submitted for approval by the Secretary of Education, then in timely fashion, a School District or Intermediate Unit, upon written notice to the parent or guardian, may in writing request approval of the Director of the Bureau of Special Education, acting as the Secretary's designee, for the transfer of particular children from private schools to the additional facility or newly created program. Any district or unit so requesting shall submit documentation of the appropriateness of the new facility or program for the particular children proposed for transfer. The parents or guardian shall be afforded a timely opportunity to comment and to submit any documentation with regard to the approval by the Department of Education of an additional facility or newly created program and with regard to its appropriateness for the particular child. If after appropriate investigation the Director of the Bureau certifies the new facility or newly created program as appropriate for those children and approves their transfers, such certification and approval shall be in lieu of individual hearings as provided above in this paragraph.

*Homebound Instruction*

30. Section 1372(3) of the School Code of 1949, as amended, 24 Purd.Stat. Sec. 13–1372(3), provides in relevant part:

*"Standards; plans; special classes or schools*

\* \* \* \* \* \*

(3) Special Classes or Schools Established and Maintained by School Districts.

. . . If . . . it is not feasible to form a special class in any district or to provide such education for any [exceptional] child in the public schools of the district, the board of school directors of the district shall secure such proper education and training outside the public schools of

the district or in special institutions, or by providing for teaching the child in his home . . . ."

31. The Secretary of Education, the State Board of Education, the named School Districts and Intermediate Units, each of them, for themselves, their officials, employees, agents and successors agree that they shall cease and desist from denying homebound instruction under Section 1372(3) to mentally retarded children merely because no physical disability accompanies the retardation or because retardation is not a short-term disability.

32. The Attorney General agrees to issue an Opinion declaring that a mentally retarded child, whether or not physically disabled, may receive homebound instruction and the State Board of Education and/or the Secretary of Education agrees to promulgate revised Regulations and forms in accord therewith, superseding the "Homebound Instruction Manual" (1970) insofar as it concerns mentally retarded children.

33. The aforesaid Opinion and Regulations shall also provide:

(a) that homebound instruction is the least preferable of the programs of education and training administered by the Department of Education and a mentally retarded child shall not be assigned to it unless it is the program most appropriate to the child's capacities;

(b) that homebound instruction shall involve education and training for at least five hours a week or for such other reasonable period as the State Board of Education may by regulation provide.

(c) that an assignment to homebound instruction shall be re-evaluated not less than every three months, and notice of the evaluation and an opportunity for a hearing thereon shall be accorded to the parent or guardian, as set out in the Order of this Court dated June 18, 1971, as amended.

34. Copies of the aforementioned Opinion and Regulations shall be filed with the Court and delivered to counsel for plaintiffs on or before February 28, 1972, and they shall be issued and promulgated respectively on or before March 8, 1972.

*Section 1375*

35. Section 1375 of the School Code of 1949, as amended, 24 Purd.Stat. Sec. 13–1375, provides:

*"Uneducable children provided for by Department of Public Welfare*

The State Board of Education shall establish standards for temporary or permanent exclusion from the public school of children who are found to be uneducable and untrainable in the public schools. Any child who is reported by a person who is certified as a public school psychologist as being uneducable and untrainable in the public schools, may be reported by the board of school directors to the Superintendent of Public Instruction and when approved by him, in accordance with the standards of the State Board of Education, shall be certified to the Department of Public Welfare as a child who is uneducable and untrainable in the public schools. When a child is thus certified, the public schools shall be relieved of the obligation of providing education or training for such child. The Department of Public Welfare shall thereupon arrange for the care, training and supervision of such child in a manner not inconsistent with the laws governing mentally defective individuals."

36. Defendants, the Commonwealth of Pennsylvania, the Secretary of Education, the State Board of Education, the named School Districts and Intermediate Units, and the Secretary of Public Welfare, each of them, for themselves, their officers, employees, agents and successors agree that they shall cease and de-

sist from applying Section 1375 so as to deny access to a free public program of education and training to any mentally retarded child.

37. The Attorney General agrees to issue an Opinion declaring that since all children are capable of benefiting from a program of education and training, Section 1375 means that insofar as the Department of Public Welfare is charged to "arrange for the care, training and supervision" of a child certified to it, the Department of Public Welfare must provide a program of education and training appropriate to the capacities of that child.

38. The Attorney General agrees to issue an Opinion declaring that Section 1375 means that when it is found, on the recommendation of a public school psychologist and upon the approval of the local board of school directors and the Secretary of Education, as reviewed in the due process hearing as set out in the Order of this Court dated June 18, 1971, that a mentally retarded child would benefit more from placement in a program of education and training administered by the Department of Public Welfare than he would from any program of education and training administered by the Department of Education, he shall be certified to the Department of Public Welfare for placement in a program of education and training.

39. To assure that any program of education and training administered by the Department of Public Welfare shall provide education and training appropriate to a child's capacities the plan referred to in Paragraph 50 below shall specify, *inter alia,*

(a) the standards for hours of instruction, pupil-teacher ratios, curriculum, facilities, and teacher qualifications that shall be met in programs administered by the Department of Public Welfare;

(b) the standards which will qualify any mentally retarded person who com-pletes a program administered by the Department of Public Welfare for a High School Certificate or a Certificate of Attendance as contemplated in Sections 8–132 and 8–133 of the Special Education Regulations;

(c) the reports which will be required in the continuing discharge by the Department of Education of its duty under Section 1302(1) of the Administrative Code of 1929, as amended, 71 Purd.Stat. Sec. 352($l$), to inspect and to require reports of programs of education and training administered by the Department of Public Welfare, which reports shall include, for each child in such programs an annual statement of educational strategy (as defined in Section 8–123 of the Special Education Regulations) for the coming year and at the close of the year an evaluation of that strategy;

(d) that the Department of Education shall exercise the power under Section 1926 of the School Code of 1949, as amended, 24 Purd.Stat. Sec. 19–1926 to supervise the programs of education and training in all institutions wholly or partly supported by the Department of Public Welfare, and the procedures to be adopted therefor.

40. The Attorney General agrees to issue an Opinion so construing Section 1375 and the Board to promulgate Regulations implementing said construction, which Opinion and Regulations shall also provide:

(a) that the Secretary of Education shall be responsible for assuring that every mentally retarded child is placed in a program of education and training appropriate to his learning capacities, and to that end, by Rules of Procedure requiring that reports of the annual census and evaluation, under Section 1371(2) of the School Code of 1949, as amended, 24 Purd.Stat. 13–1371(2), be made to him, he shall be informed as to the identity, condition, and educational

status of every mentally retarded child within the various school districts.

(b) that should it appear that the provisions of the School Code relating to the proper education and training of mentally retarded children have not been complied with or the needs of the mentally retarded child are not being adequately served in any program administered by the Department of Public Welfare, the Department of Education shall provide such education and training pursuant to Section 1926 of the School Code of 1949, as amended, 24 Purd.Stat. Sec. 19–1926.

(c) that the same right to notice and an opportunity for a hearing as is set out in the Order of this Court of June 18, 1971, shall be accorded on any change in educational assignment among the programs of education and training administered by the Department of Public Welfare.

(d) that not less than every two years the assignment of any mentally retarded child to a program of education and training administered by the Department of Public Welfare shall be re-evaluated by the Department of Education and upon such re-evaluation, notice and an opportunity to be heard shall be accorded as set out in the Order of this Court, dated June 18, 1971, as amended.

41. Copies of the aforesaid Opinion and Regulations shall be filed with the Court and delivered to counsel for plaintiffs on or before February 28, 1972, and they shall be issued and promulgated respectively on or before March 8, 1972.

## IV.

42. Each of the named plaintiffs shall be immediately re-evaluated by defendants and, as soon as possible, but in no event later than October 13, 1971, shall be accorded access to a free public program of education and training appropriate to his learning capacities.

43. Every retarded person between the ages of six and twenty-one years as of the date of this Order and thereafter shall be provided access to a free public program of education and training appropriate to his capacities as soon as possible but in no event later than September 1, 1972.

44. Wherever defendants provide a pre-school program of regular education and training for children less than six years of age, whether kindergarten or however called, every mentally retarded child of the same age as of the date of this Order and hereafter shall be provided access to a free public program of education and training appropriate to his capacities as soon as possible but in no event later than September 1, 1972.

45. The parties explicitly reserve their right to hearing and argument on the question of the obligation of defendants to accord compensatory educational opportunity to members of the plaintiff class of whatever age who were denied access to a free public program of education and training without notice and without a due process hearing while they were aged six years to twenty-one years, for a period equal to the period of such wrongful denial.

46. To implement the aforementioned relief and to assure that it is extended to all members of the class entitled to it, Herbert Goldstein, Ph.D. and Dennis E. Haggerty, Esq. are appointed Masters for the purpose of overseeing a process of identification, evaluation, notification, and compliance hereinafter described.

47. Notice of this Order and of the Order of June 18, 1971, in form to be agreed upon by counsel for the parties, shall be given by Commonwealth defendants to the parents and guardian of every mentally retarded person, and of every person thought by defendants to be mentally retarded, of the ages specified in Paragraphs 43, and 44 above, now resident in the Commonwealth of Penn-

sylvania, who is not being accorded access to a free public program of education and training, whether as a result of exclusion, postponement, excusal, or in any other fashion, formal or informal.

48. Within thirty days of the date of this Order, Commonwealth defendants shall formulate and shall submit to the Masters for their approval a satisfactory plan to identify, locate, evaluate and give notice to all the persons described in the foregoing paragraphs, and to identify all persons described in Paragraph 45, which plan shall include, but not be limited to, a search of the records of the local school districts, of the Intermediate Units, of County MH/MR units, of the State Schools and Hospitals, including the waiting lists for admission thereto, and of interim care facilities, and, to the extent necessary, publication in newspapers and the use of radio and television in a manner calculated to reach the persons described in the foregoing paragraph. A copy of the proposed plan shall be delivered to counsel for plaintiffs who shall be accorded a right to be heard thereon.

49. Within ninety days of the date of this Order, Commonwealth defendants shall identify and locate all persons described in paragraph 47 above, give them notice and provide for their evaluation, and shall report to the Masters the names, circumstances, the educational histories and the educational diagnoses of all persons so identified.

50. By April 1, 1972, Commonwealth defendants shall formulate and submit to the Masters for their approval a plan, to be effectuated by September 1, 1972, to commence or recommence a free public program of education and training for all mentally retarded persons described in Paragraph 47 above, and for all mentally retarded persons of such ages hereafter. The plan shall specify the range of programs of education and training, their kind and number, necessary to provide an appropriate program of education and training to all mentally retarded children, where they shall be conducted, arrangements for their financing, and, if additional teachers are found to be necessary, the plan shall specify recruitment, hiring, and training arrangements. The plan shall specify such additional standards and procedures, including but not limited to those specified in Paragraph 39 above, as may be consistent with this Order and necessary to its effectuation. A copy of the proposed plan will be delivered to counsel for plaintiffs who shall be accorded a right to be heard thereon.

51. If by September 1, 1972, any local school district is not providing a free public education to all mentally retarded persons within its responsibility as provided hereinbefore in special classes or schools established and maintained by school districts or has not secured such proper education and training outside the public schools of the district or in special institutions, and if an intermediate unit is not providing such education by means of additional classes or schools as are necessary or otherwise providing for the proper education and training of such persons who are not enrolled in classes or schools maintained and operated by school districts or who are not otherwise provided for, the Secretary of Education, pursuant to Section 1372(5) of the Public School Code of 1949, 24 Purd.Stat. 1372(5), shall directly provide, maintain, administer, supervise and operate programs for the education and training of these children.

52. The Masters shall hear any members of the plaintiff class who may be aggrieved in the implementation of this Order.

53. The Masters shall be compensated by Commonwealth defendants.

54. This Court shall retain jurisdiction of the matter until it has heard the final report of the Masters on or before October 15, 1972.

55. Any child who is mentally retarded and who also has another exceptionality or other exceptionalities, whether blind, deaf, cerebral palsied,

**316**

brain damaged, muscular dystrophied or social or emotionally disturbed, or otherwise, irrespective of the primary diagnosis, shall be considered mentally retarded for purposes of the Agreements and Orders herein.

[s] T. K. Gilhool
    Thomas K. Gilhool
    Attorney for Plaintiffs

[s] J. Shane Creamer
    J. Shane Creamer
      Attorney General

[s] Ed Weintraub
    Ed Weintraub
      Deputy Attorney General
      Attorneys for Defendants

[s] John C. Pittenger

    Acknowledged:

    Secretary of Education

[s] William Ohrtman
    Dr. William F. Ohrtman
      Director, Bureau of
      Special Education

[s] Helene Wohlgemuth
    Mrs. Helene Wohlgemuth
      Secretary of Public
      Welfare

[s] Edward R. Goldman
    Edward R. Goldman
      Commissioner of Mental
      Retardation